## Summers Estate.

Argued September 29, 1966. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Barney Phillips,* with him *Morton B. DeBroff* and *Benjamin Jacobson,* for appellant.

*Meyer Umansky* and *Stanley Makoroff,* for appellees.

OPINION BY MR. JUSTICE JONES, January 20, 1967:

Petitioner, J. I. Simon (Simon), administrator of the estate of James M. Summers (Summers), appeals from a decree of the Orphans' Court of Allegheny County, No. 132- of 1963 refusing and dismissing his petition which prayed that an order be entered directing William Patton (Patton) and/or Hufstader-Cadillac, Inc. (Hufstader) to return one 1963 Cadillac coupe to the estate of Summers or, in the event of its resale, to account for its selling price. The orphans' court found both possession and *actual* ownership of the Cadillac to be vested in Patton.

The web of events involved in this litigation requires careful scrutiny in view of the bizarre position in which the parties ultimately found themselves.

In 1962, Patton's credit rating was virtually nil both because the United States Government and several creditors had liens filed against him and because a prior car of his had been repossessed. Patton owned a 1961 Chrysler titled in his wife's maiden name, Eva McDaniels, and which, in May, he wanted to trade in for a 1962 Cadillac from Hufstader. After discussing the proposed purchase with a salesman and being advised that, while no sale could be made to him personally, a purchase could be made in the name of a person with a good credit rating, Patton contacted Summers. Summers agreed that the 1962 Cadillac should be pur-

chased in his name and he would sign the installment sales contract and this was done. The Chrysler was traded in, Summers signed the installment sales contract,[1] the balance of the purchase price was financed by the Mellon National Bank and Trust Co. (Mellon Bank) and Patton took possession of the car and made finance payments or supplied the money for finance payments made by Summers to the Mellon Bank.

In June of 1963, Patton again went to Hufstader to purchase a 1963 Cadillac. The 1962 Cadillac was traded in and the balance of the purchase price on the 1963 Cadillac was financed by the Mellon Bank. Both Patton and Summers signed the installment sales contract and, again title was taken in Summers name and, as is standard practice as part of the financing plan, an insurance policy was issued on Summers' life. Again, Patton made the finance payments.

On December 8, 1963, Summers died intestate, survived by his widow, Lulu Summers. The insurance company paid the balance of finance payments on the 1963 Cadillac ($4,246.13) and the Mellon Bank marked the title "Encumbrances satisfied" and on January 3, 1964, mailed it to "James M. Summers: attention of Mrs. Summers".

Thereafter, Patton, knowing the insurance paid off the encumbrance, went to Hufstader to negotiate for the purchase of a 1964 Cadillac. There he was informed that before Hufstader could accept title to the 1963 Cadillac there would have to be an assignment of the certificate of title by whoever was executor of Summers' estate. Thereupon started a series of startling events. Somehow Patton came into possession of the title. On December 31, 1963, two persons allegedly ap-

---

[1] The installment purchase agreement, in addition to the regular finance charges, included a premium for life insurance which would, in the event of Summers' death, pay off the remaining amount owed on the car.

peared before a notary public, represented themselves to be James M. and Lulu Summers, and executed an assignment of certificate of title.[2] In February 1964, Hufstader reassigned the title to one V. I. Mahdich who, upon learning of the fraud, returned the car to Hufstader. Hufstader later sold the Cadillac to a New York dealer.

Our Vehicle Code, Act of April 29, 1959, P. L. 58, §201, §3201(a), 75 P.S. §201 provides: "(a) No person who is a resident of this Commonwealth shall own a motor vehicle, trailer, or semi-trailer, in this Commonwealth unless a certificate of title therefor shall have been obtained as provided in this act." Petitioner argues this statutory provision proscribes any such thing as equitable ownership of motor vehicles and that no ownership can exist in one who does not hold a Certificate of Title. This argument is without merit. The mere fact that The Vehicle Code was violated by not placing title in Patton's name per se does not render void the transaction between Patton and Summers so as to result in ownership of the Cadillac being in Summers. Although an indicium of ownership, a certificate of title is not conclusive evidence of ownership. of a motor vehicle but rather establishes the person entitled to *possession*: *Speck Cadillac-Olds, Inc. v. Goodman,* 373 Pa. 83, 88, 95 A. 2d 191 (1953); *Majors v. Majors,* 349 Pa. 334, 37 A. 2d 528 (1944); *Kump v. State Automobile Ins. Assn.,* 35 Pa. D. & C. 2d 238 (1964); *Rice Street Motors v. Smith,* 167 Pa. Superior Ct. 159, 74 A. 2d 535 (1950).

Having found that The Vehicle Code does not of. itself invalidate the transaction we must next see

---

[2] Not only was Summers dead some 23 days *before* this .date but also the title never left possession of the Mellon Bank until January 3, 1964—some three days *after* this date. The conduct relative to the assignment of title is immersed in such fraud and misdealing as to void that assignment.

whether a resulting trust arose in Patton's favor. "A resulting trust arises where a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest therein, unless the inference is rebutted and the beneficial interest is otherwise effectively disposed of". Restatement 2d, Trusts, §404 (1959). The evidence clearly, precisely and convincingly establishes that Summers had bare legal title only while Patton had the beneficial interest together with possession.

Were it shown that such conveyance to Summers was for the purpose of defrauding Patton's creditors a resulting trust would not arise. Where one purchases property and for the purpose of defrauding his creditors takes title in the name of another upon a secret trust for him, the purported trust is invalid. Restatement 2d, Trusts, §63, comment b to Subsection (1); *Policarpo v. Policarpo*, 410 Pa. 543, 189 A. 2d 171 (1963). Title was here taken in Summers' name because Hufstader would not allow Patton credit and no intent to defraud has been shown. The inference that the transaction was for such purpose is rebutted by the fact that Patton raised his mortgage and paid off all his creditors.

Petitioner also advances the argument that Patton would be unjustly enriched were he allowed to benefit from the insurance satisfying the encumbrance on the Cadillac since he had no equitable interest on Summers' life. Citing our Insurance Law, Act of May 17, 1921, P.L. 682, as amended, 40 P.S. §512, which provides "no person shall cause to be insured the life of another, unless the beneficiary named in such policy or agreement of life insurance . . . has an insurable interest in the life of the insured . . . ." and petitioner maintains that Patton, in paying the premiums, in effect in-

sured Summers's life with himself as the beneficiary—a life in which he had no insurable interest. Petitioner cites *Haberfeld v. Mayer*, 256 Pa. 151, 100 A. 587 (1917) which does not support him. *Haberfeld* states (at pp. 153-4) that the personal representative of an insured can recover back the amount paid to a beneficiary where the person *who took out the insurance* and paid the premiums, or took an assignment of a policy already issued, has no insurable interest on the life of the insured. Patton did not take out the insurance nor did he take an assignment of it. Summers, not Patton, took out the insurance as part of the installment sales contract, and we note, parenthetically, that both Summers and Patton were liable on that contract.

For the reasons stated herein the decree of the lower court is affirmed. Appellant pay costs.

---

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

Whichever way this litigation is resolved, one of the parties will receive a substantial windfall. That being so, I fail to see why the orphans' court (a court acting upon equitable principles) should reward the party whose hands are clearly the more soiled of the two.[1] Moreover, I do not believe that the majority is correct in raising a resulting trust in favor of Patton. It appears to be admitted that the transaction from which the resulting trust is raised would have had the effect of placing beyond the immediate grasp of Patton's

---

[1] The only blot on Summers' conduct was his willingness to lend his name and credit to a transaction which was a fraudulent conveyance in the strict legal sense, and possibly, to his knowledge, a fraud in fact. Patton was not only the principal actor and instigator of the above mentioned transactions, but was also the knowing beneficiary if not the instigator of the forged and false assignment of the automobile title from the estate of Summers. This latter fact would of itself be sufficient to preclude Patton from invoking the aid of an equity court in creating a resulting trust for his benefit.

creditors an asset of substantial value and that Patton was insolvent, at least in the equitable sense of that term, at the time of the transaction. The transaction was, therefore, a fraud on Patton's creditors sufficient to prevent the raising of a resulting trust, *Policarpo v. Policarpo*, 410 Pa. 543, 189 A. 2d 171 (1963); Restatement 2d, Trusts, §§63, 422, 444, at that time. The fact that Patton may subsequently have paid his creditors does not make the initial transaction any the less fraudulent.[2]

Although I am persuaded that, as between Patton and Summers' Estate, the latter is entitled to any windfall, it does not seem fair in this case to enrich Summers' Estate at Patton's expense. I see no reason why the orphans' court should not, in making an award to the estate, deduct therefrom the amounts expended by Patton for the automobile and for the insurance premiums.

I dissent therefore from the majority's result which affirms the award of a windfall to one who, with federal tax liens and other claims of creditors outstanding against him, sought to funnel his income into an asset titled in the name of another and now claims the benefit of a policy of insurance on the life of that other which was designed solely to protect the estate and creditors of that other.

Mr. Chief Justice BELL joins in this dissenting opinion.

---

[2] See Act of May 21, 1921, P. L. 1045, §§1-4, 39 P.S. §§351-354.