Sechler *v.* Sechler, Appellant.

2

Argued September 30, 1960. Before JONES, C. J., BELL, MUSMANNO, JONES, BOK and EAGEN, JJ.

*Gilbert M. Gerber*, with him *Thomas A. Swope, N. H. Leventon, Charles H. Harris, William D. Shettig*, and *Shettig, Swope & Shettig*, for appellant.

*Lawrence L. Davis*, with him *Davis and Davis*, for appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, March 23, 1961:

In the Court of Common Pleas of Cambria County, Margaret Sechler on April 13, 1958 instituted an

equity action against W. B. Sechler (Sechler), her
brother, wherein she sought: (1) to enjoin him from
encumbering the Highland Hotel, Ebensburg Bor-
ough; (2) to have him declared trustee for her of a
one-half interest in that property; (3) to have him
account for one-half of the rents of the property since
February 7, 1958 (the date of death of Elsie Sechler,
the parties' mother).[1]

Upon issue joined and after a hearing,[2] the court
below in a decree nisi declared Sechler trustee for
Miss Sechler of "one-half of the net proceeds of the
real estate and personal property of the Highland Ho-
tel" allowing Sechler to deduct $8578 advanced by him
to Elsie Sechler, the parties' mother. The court en
banc dismissed exceptions to this decree and its final
decree is the subject of this appeal.

Part of the factual background of this action is
undisputed. On August 24, 1926, J. L. Sechler and
Elsie Sechler, his wife, became owners, as tenants by
the entireties, of the Highland Hotel property. Upon
J. L. Sechler's death on March 2, 1928, Elsie Sechler,
by operation of law, became the sole owner.[3] Through
the medium of a straw-man, on April 2, 1940, Elsie
Sechler conveyed by deed the Highland Hotel prop-
erty to herself and Sechler, as joint tenants with right
of survivorship. Coincident thereto, Miss Sechler be-

---

[1] After institution of suit, Highland Hotel, by agreement of
the parties, was sold and the proceeds ($43,000 from the realty
and $3000 from the furnishings) were placed in escrow to await
outcome of this litigation. As a result, prayer (1) became moot,
prayer (3) was not pressed and, as to prayer (2), Miss Sechler
sought to impress the proceeds, rather than the realty, with a
trust.

[2] There were three witnesses: Miss Sechler, a Mrs. Knepper
and W. B. Sechler, called as of cross-examination.

[3] In addition to his widow, J. L. Sechler was survived by two
children, the present litigants.

4

came the sole beneficiary of *all* her mother's life insurance policies.[4] Both prior and subsequent to April 2, 1940, Sechler advanced moneys to his mother.[5] Miss Sechler did not learn of the transfer of the Highland Hotel until sometime between 1943 and 1946 when she happened to be in the courthouse. Upon learning thereof, Miss Sechler talked with both her mother and brother about the transaction. Approximately five years later (1951) certain correspondence between mother and daughter took place. In 1944 the mother prepared a memorandum in which she stated that her son had purchased a one-half interest in Highland Hotel and that "[i]t was not a gift". In 1932 the mother made a will in which she specifically devised Highland Hotel and disposed of part of her insurance;[6] in 1956 she made a will in which no reference was made to the hotel property or her insurance.

Our language in *Commonwealth Trust Co. v. Szabo,* 391 Pa. 272, 276, 277, 138 A. 2d 85, is applicable: "In passing upon the questions raised on this appeal we must adhere to the well-established rule that a chancellor's findings of fact, approved by a court en banc, have all the force and effect of a jury's verdict if they are supported by adequate evidence and ordinarily will not be disturbed on appeal: [citing cases]. However, the chancellor's 'conclusions, whether of law or ultimate fact are no more than his reasoning from the un-

---

[4] These policies included a $6400 annuity contract and a $1500 policy of Equitable Life Insurance Company of New York, a $1000 policy of Ladies Catholic Beneficial Association and a $325 policy of Prudential Insurance Company.

[5] Whether termed "loans" or "payments on the property", it is a fact that advancements were made.

[6] She directed that the proceeds of a $5000 Equitable Life policy be applied toward liquidation of a $10,000 mortgage on her realty and she gave the hotel property, furniture and equipment to her two children, share and share alike.

derlying facts and are reviewable', especially 'where the underlying facts themselves are not in esse but are matter of inference and deduction': [citing cases]. Furthermore, a chancellor's findings of fact, even though approved by a court en banc, need not be accepted as conclusive if there is no evidence to support them or if they are based on an inference erroneously taken [citing cases], or where the evidence, in order to prevail, must be clear, precise and indubitable or must meet some other prescribed standard [citing a case]."

An examination of the deed of April 2, 1940 reveals: (1) that no mention is made of *any* agreement between the parties,[7] more specifically an agreement that, in the event Highland Hotel be sold, Miss Sechler and Sechler were to equally share the proceeds; (2) it is absolute on its face, regular as to form, contents and execution and unambiguous and certain in its provisions; (3) that it recites a consideration of one ($1) Dollar and no federal revenue stamps were affixed.[8] In this respect the language approved by this Court in *Zahorsky v. Leschinsky*, 394 Pa. 368, 372, 147 A. 2d 362, is most appropriate: "It is obvious that an express trust could not be proved for . . . the title documents contain no words establishing a trust and the transfer to . . . [the grantee] was absolute in form. Furthermore, any effort to establish under the circumstances an express trust would be met by the bar of parol evidence rule, Restatement, Trusts, §38, and the bar of the Pennsylvania Statute of Frauds . . ." Under the circumstances, Miss Sechler

---

[7] Other than, of course, the conveyance of the property to Elsie and W. B. Sechler, as joint tenants with right of survivorship.

[8] Although emphasized by the court below, the fact that neither the wife nor children of Sechler are mentioned in the deed is without relevant significance.

does not, nor could she, rely upon an *express* trust. She contends that, by reason of events which took place subsequent to April 2, 1940, she has proven that there was an agreement between the parties at or before the transfer of title which gave rise to an *implied* trust.

It would appear, from a study of his opinion, that the rationale of the chancellor is that, on or before April 21, 1940, the mother and son entered into an oral agreement whereby Highland Hotel would be transferred to them as joint tenants with right of survivorship and the son agreed with the mother that, in the event she predeceased him, he would share equally with his sister the net proceeds of the sale of the hotel property. It was "not an agreement to hold land in trust for another" but "an agreement whereby the owner [Elsie Sechler] transferred land to another person [Sechler], upon an oral agreement to sell [the land] and pay the proceeds to a third person [Miss Sechler]." Having found factually that such agreement had been made, the court, on the authority of comment g, Section 52, Restatement, Trusts, concluded that, upon the sale of Highland Hotel, there was a binding contract to hold the proceeds in trust.[9] It is obvious that the propriety of the decree depends on two factors: whether there is *any* evidence on this record proving that there was an agreement between the mother and the son and, if there be such evidence, whether it qualitatively equates the standard of proof required to impress an oral trust on the proceeds of the sale of the hotel property.

---

[9] Quoting from comment g, supra, the court said: ". . . although the transfer of the land is the consideration for the promise to hold the proceeds in trust, the proceeds are personal property and the contract is not required by the Statute of Frauds to be in writing."

Basic in our approach to the second factor, i.e., the standard of proof required is the rule: "It is axiomatic that to prove a trust by parol the evidence must be *clear, precise* and *indubitable."* (Emphasis supplied): *Danner v. Danner,* 366 Pa. 178, 180, 77 A. 2d 217. In *Moffitt v. Moffitt,* 340 Pa. 107, 110, 16 A. 2d 418, we had previously said: "Evidence to support a parol trust must be *direct, positive, express, unambiguous* and *convincing*: [citing cases]." (Emphasis supplied). Unless the evidence equates this standard a parol trust cannot be established. The reason for the rule is evident: unless the evidence of the existence of an oral trust is of the highest probative value, equity should not act to convert an absolute ownership into an estate of lesser quantity.

As analyzed by the court below, five facets of the testimony furnished the "underlying facts" from which it could be inferred that there *had* been an agreement creating an oral trust. Such testimony was: (1) that the mother treated advances made by her son as loans and not as payments for the purchase of an interest in Highland Hotel; (2) that approximately four years after the date of the conveyance Miss Sechler was informed by her mother and brother that the purpose of the conveyance was to protect the mother and avoid payment of taxes[10] but she, Miss Sechler, would not lose but everything would be divided evenly; (3) that the mother's letters to Miss Sechler in 1951—eleven years after the conveyance—indicated the existence of the agreement; (4) Miss Sechler's testimony that in 1952 her brother had told her: " 'Don't worry'. . . . 'I have about $8,000 in the hotel. Say we sell it for $50,-000, give me my $8,000, we divide the balance.' "; (5) Sechler's testimony that he never intended to keep all the property. Does such testimony justify the inference

[10] Cf: The factual situation in *Moffitt v. Moffitt,* supra, p. 109.

8

and deduction drawn by the chancellor that there was an agreement which justified the impressment of an oral trust upon the proceeds of the sale and was such testimony clear, positive and convincing of that fact?

The chancellor was impressed by the fact that notations by the mother indicated that she treated advancements of money by the son as loans rather than as payments on the property. At the same time, the chancellor placed little weight on the mother's handwritten certification in December, 1944 that the son had purchased and was not given a half interest in the hotel. The evidence each way came from the same source (the mother) and the same type of proof (written documents) and was highly contradictory. Whether the advances were loans or part payments, what is their significance? It is undisputed that the son did advance moneys to his mother; if loans, they might have furnished the motive for a gift of an interest in the hotel, while if part payments, they might have (as the mother stated) purchased a half-interest in the hotel. But such advances would only be significant as negating Miss Sechler's position, i.e., that the conveyance was for the purpose of avoiding taxation and not for the purpose of effecting an irreversible *transfer of title.* Miss Sechler neither disputes the conveyance nor transfer of title, but rather takes the position that the brother, in connection with the conveyance, made an oral promise to the mother for her (Miss Sechler's) benefit. It was Miss Sechler's burden to prove such oral promise had been made. There was no burden, in the absence of proof of a confidential relationship, on the son to prove *why* the conveyance was made. Implicit in the deed and its provisions is the conveyance of an interest in the hotel to the son and by such conveyance, prima facie the son acquired a right of ownership. We fail to attach any real significance to this phase of the testimony inso-

far as it might prove the oral agreement which is the keystone of Miss Sechler's cause. Even if significant, the testimony is so conflicting and contradictory that it does not measure up to the high standard of proof required.

The next phase of the testimony comes from certain conversations testified to by Miss Sechler. Upon learning of the conveyance sometime between 1944 and 1946 she talked to her mother and brother and they assured her that "everything would be divided evenly", that she had nothing to worry about and that it (the conveyance) "was all in kindness" and "not meant to be any loss" to her. Assuming, as did the chancellor, that such conversations took place, what is their probative value? The statement "everything would be divided evenly" might have meant either the mother's entire estate[11] or the hotel property and is of little weight; it did not prove any oral agreement, and, in order to relate it to the hotel property, an inference to that effect would have to be drawn. Furthermore, as we said in *Moffitt,* supra (p. 111), considering similar statements: "Declarations and admissions by the parties, after the execution of the deed, are admissible, in corroboration of other evidence, to establish the trust, but in and of themselves they are inadequate, in the absence of testimony from witnesses who heard the bargain when it was made or who heard the parties repeat it in each other's presence. [citing cases]." Such conversations lacked any probative value as to the existence of an oral understanding

---

[11] It must be recalled that at or about the same time the hotel was conveyed the mother transferred to the daughter all her life insurance—having a face value in excess of $9000. *Query*: Was the equity in Highland Hotel (then, on the record, in poor financial situation) equatable with the face value of the life insurance?

and certainly were not entitled to the weight given them by the chancellor.

Eleven years after the conveyance and, at least, five years after the discovery thereof by Miss Sechler, the latter received two letters from her mother. The first letter (November 4, 1951), so far as herein pertinent, stated: "I can't see how you could think B. [the son] & I would not help you, instead of against you. Made us both feel bad. I hope you don't talk about me or . . . [the son] cheating you . . . This stuff shure upsets me and why you would have any reason to think . . . [the son] & I would do anything that wasn't honest against you". Beyond an expression of resentment at the daughter's attitude, this letter lacks meaning on the present issue. On November 19, 1951 the mother again wrote her daughter: "No I am not going to change the Deed and you will get your share same as . . . [the son] & we have things fix up that you both get your amount. Unless times get aughful bad and you can't tell how times will be. And you know you would get your share and if I go first everything will be fixed up. Sell Hotel and pay off all debts & divide 1-2. So that best that can be done." Deciphering the meaning of this letter is difficult. Apparently the daughter had requested a change in the deed to which request the mother refused to accede, assuring the daughter that both children were to receive equal treatment. The chancellor, stressing that the phrase "we have things fix up": is in the perfect tense, concludes that it refers to the existence of an agreement and assigns it high probative value. With this conclusion we cannot agree. The next line in the letter "Unless times got aughful bad and you can't tell how times will be" would seem to condition the preceding sentence and is subject to the interpretation that both son and daughter would share equally if economic conditions at the time warranted it. Did

the mother, mindful of the transfer to the daughter of her insurance, mean that the *actuality of the equality* of that which had in the past been transferred to each of her children would depend on the impact of economic conditions at the time of her death on the value of Highland Hotel and the insurance policies? Only by speculation and conjecture can any meaning be attached to this portion of the letter, particularly as the mother then said "if I go first everything *will* be fixed up". The important lines in this letter: "Sell hotel and pay off debts and divide 1-2" could be construed in several ways: that an agreement *had been* made whereby the hotel was to be sold and the proceeds divided between the children, that an agreement *would be* made to the same end, or, mindful that the mother had already certified that the son had *purchased* a one-half interest in the hotel, that the net proceeds of the sale of the remaining one-half interest in the hotel was to be divided between the two children. Construing this letter in the light most favorable to Miss Sechler, this letter falls woefully short of the standard of proof required to establish an oral trust.

Lastly, it is urged that Sechler's testimony that he "was not, and I never intended, to keep it all" clinches the establishment of a promise on his part to sell the hotel and divide the proceeds between his sister and himself. In *Moffitt*, supra, we said (p. 111): " '[U]nkept promises, declarations, or misrepresentations which will create trustees ex maleficio, must be made before or at the time the legal title is acquired or the devise made; for nothing subsequently said by a grantee or devisee will turn an estate that has passed absolutely from the grantor or testator into a trust for others.' " In *Gassner v. Gassner*, 280 Pa. 313, 317, 124 A. 483, declarations of a wife-grantee that property which had been conveyed to her by her husband

really belonged to her husband and that she was willing to reconvey it to him were held insufficient to establish a trust, such declarations having been made subsequent to the conveyance. Sechler's testimony was simply an expression of future intent and not an acknowledgment that at the time of the conveyance to him and his mother of Highland Hotel there was an agreement between his mother and himself for the eventual distribution of the net proceeds from the sale thereof to his sister and himself.

In considering this record, we start with the presumption of right which exists in favor of the son in whom the legal title is lodged: *Metzger v. Metzger,* 338 Pa. 564, 14 A. 2d 285; *Majors v. Majors,* 153 Pa. Superior Ct. 175, 33 A. 2d 442, aff'd. 349 Pa. 334, 37 A. 2d 528. Furthermore, outside of the relationship of kinship between Mrs. Sechler and her son, there is no proof of any confidential relationship and it is neither alleged nor proven that the son acted fraudulently in securing this conveyance. An examination of the complaint and the testimony in its entirety indicates that it is Miss Sechler's theory that at or before the time of the conveyance her brother made to her mother an oral promise which she alleges he has breached. We need not consider whether the breach of this oral promise, if made, would be sufficient to establish a parol trust (*Metzger v. Metzger,* supra) because, in our view, the record does not establish that *any* oral promise was in fact made. It was encumbent upon Miss Sechler to establish that an oral agreement was made and to do so by clear, positive and convincing testimony. In this she did not succeed. We fail to find any proof, as distinguished from speculation or conjecture, of any oral understanding; even if there be such proof, the fact of an oral agreement has not been established with the requisite quality of proof.

Oral trusts are not favored by the law. Properly our courts have insisted on proof of the highest quality as a pre-requisite to recognition of oral trusts. The testimony on this record is gravely wanting in this respect.

In view of the conclusions reached, we need neither discuss nor consider the nature of the implied trust sought to be imposed.

Decree reversed. Each party to pay his or her own costs.

Mr. Justice MUSMANNO dissents.