**Penza Estate**

Before Klein, A. J., Saylor, Shoyer, Pawelec & Silverstein, JJ.

SHOYER, J., September 13, 1972.—James Vincent Penza, the testator, died January 31, 1968, not survived by spouse or issue, leaving a will dated January 26, 1967, whereby he gave his entire estate to his niece, Yolanda C. Monticelli, and named her executrix.

Letters testamentary were granted to Yolanda C. Monticelli, the accountant, on July 31, 1969, and proof of publication of the grant of the same is hereto annexed.

Testator's sister, Adelinda Aversa, and testator's nephew, William Penza, and his niece, Rosalie Penza (children of testator's brother, Anthony Penza, who died in April 1932) objected to the accountant's proposed distribution to Yolanda Monticelli of the entire estate under the will. They contend that the residuary estate comprises a constructive trust held by testator as constructive trustee, for all members of the Penza family, viz: Adelinda Aversa, 25 percent; William Penza, 12½ percent; Rosalie Penza, 12½ percent; Mario and Yolanda Monticelli each 12½ percent; and the Estate of Chlorinda Spinelli, deceased (a sister), 25 percent.

The Estate of Chlorinda Spinelli, her three children, and Mario Monticelli (brother of the accountant), though informed of this contest, have not appeared or made any claim. Shortly after testator's death, Adelinda filed a caveat with the register of wills. She alleged that her brother, James, lacked testamentary capacity when he executed his will and that its execution was obtained under constraint and undue influence, and that the assets belonged to a constructive trust held by testator as constructive trustee for the benefit of the Penza family. After extended hearings, at which several witnesses, including Claude O. Lanciano, Esq., and Lester J. Schaeffer, Esq., testified in support of the alleged secret trust, the register dismissed the caveat. He filed an opinion which held that the question of the constructive trust was irrelevant to the devisavit and that the evidence submitted established that testator had testamentary capacity when he executed the proffered will, dated January 26, 1967, and that the allegations of constraint and undue influence had not been sustained.

The register's decision was appealed to this court

by Adelinda. Subsequently, her counsel and counsel for Yolanda entered into a stipulation which was approved by the court, Lefever, J., on July 11, 1969. The stipulation provided, inter alia, that Adelinda's appeal be withdrawn, that the register's decree dated July 12, 1968, dismissing the caveat and admitting to probate testator's writing dated January 26, 1967, as his last will and testament be affirmed. It was also stipulated that testator's next of kin should have the right to raise the question of the constructive trust at the audit of the executrix' account.

At the conclusion of the caveat proceedings, the register appointed an administrator pendente lite, whose account was confirmed by adjudication of Saylor, J., dated November 5, 1969, which, inter alia, awarded the distributable balance to the present accountant. The fund is now ready for distribution.

It is noteworthy, as stated supra, that the Estate of Chlorinda Spinelli, testator's sister who survived decedent, and her three children, and Mario Monticelli, a nephew, have made no claim to any part of this substantial estate.

The auditing judge was immeasurably aided by the arguments and very able briefs which were submitted by opposing counsel.

Counsel for the accountant point out that the objectors' claims are predicated upon an alleged oral agreement between Biagio Penza and his three surviving sons, John, Thomas and James Vincent. The only documents offered in evidence which meet the requirements of the Wills Act are the will of Biagio Penza and the wills of his sons, John, Thomas and James Vincent Penza. None of these wills contains a single word about any family trust. And, since most of the property which the objectors claim to be included in the alleged oral trust is real estate, an express

oral trust could not prevail for failure to meet the requirements of the statute of frauds: Act of April 22, 1856, P.L. 532, sec. 4, 33 PS §2; Silver v. Silver, 421 Pa. 533, 219 A.2d 659 (1966); Metzger v. Metzger, 338 Pa. 564, 14 A.2d 285 (1940). An oral trust in real estate is unenforceable as an express trust: Kalyvas, v. Kalyvas, 371 Pa. 371, 89 A.2d 819 (1952).

Counsel for the accountant acknowledge that the court may construct a trust to prevent fraud or unjust enrichment, as where a testator devises or bequeaths property to a person in reliance upon his oral agreement to hold property in trust: Restatement 2d, Trusts, §55(1); but only if it is shown by "direct, positive, express, unambiguous and convincing" evidence that there was (a) an oral agreement to hold in trust; (b) the terms of the trust, and (c) a transfer in reliance upon the oral agreement: Sechler v. Sechler, 403 Pa. 1, 169 A.2d 78 (1961).

Counsel for objectors cite Blick v. Cockins, 234 Pa. 261, 83 Atl. 196 (1912), where our Supreme Court stated, page 265:

"The doctrine is too well established to call for citation of authority that where a testator has been induced to make a devise by the promise of the devisee that it should be applied to the benefit of another, a trust is thereby created that may be established by parol evidence, and that this is not contrary to the Statute of Wills nor within the *Statute of Frauds and Perjuries*. It is the element of fraud appearing in the case that gives the court jurisdiction to inquire into it, not with a view of enforcing a parol trust, *but to relieve against fraud* by raising a constructive trust:" Pierro v. Pierro, 438 Pa. 119, 264 A.2d 692 (1970); Brenneman Estate, 360 Pa. 558, 562, 63 A.2d 59 (1949); Church v. Ruland, 64 Pa. 432,

442 (1870); Fickes's Estate, 59 Pa. Superior Ct. 535, 537 (1915). (Italics supplied.)

The rule as to secret trusts is stated in the Restatement 2d, Trusts, §55:

"(1) Where a testator devises or bequeaths property to a person in reliance upon his agreement to hold the property in trust, the devisee or legatee holds the property upon a constructive trust for the person for whom he agreed to hold it."

"Comment

"a. Constructive trust. The constructive trust which is imposed under the rules stated in this Section arises out of the breach of an intended express trust which is unenforceable because of the failure to comply with the requirements of the Statute of Wills. Where the devise or bequest is induced by the agreement of the devisee or legatee to hold the property in trust, he would be unjustly enriched if he were permitted to retain it. He is therefore chargeable as a constructive trustee. . ."

In Pierro, supra, the court noted at page 127,:

". . . 'A constructive trust arises where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it.' 5 Scott, Trusts, §462 at 3413 (3d ed. 1967); Restatement, Restitution, §160 (1937); Chambers v. Chambers, 406 Pa. 50, 176 A.2d 673 (1962); Gray v. Leibert, 357 Pa. 130, 53 A.2d 132 (1947). . ."

The uncontroverted, admitted facts establish as the family background that testator's father, Biagio Penza, came to this country from Italy with his wife, Rose, and their daughter, Chlorinda, who was born in 1885, before the close of the nineteenth century. Thereafter, seven other children were born to Biagio and Rose

in this country in the following order: Anthony, John, Almerinda, Thomas, James Vincent, Adelinda and Assunta.

Biagio retired from his produce business in 1928 and was succeeded in the business by his eldest son, Anthony, who was married and had two children, William, born in 1916, who is still living, and Rosalie, who is sui juris. These are two of the present claimants.

Chlorinda, Almerinda and Adelinda all married and had children. Chlorinda Spinelli had three children, William, Anthony and Albert, all sui juris. Almerinda Monticelli had two children, Yolanda, the accountant, born in 1914, and Mario, born in 1918, both of whom are living. Adelinda Aversa had a son Zefferino, born in 1926, who is sui juris. Assunta, Biagio's youngest daughter never married; she died in 1927 without leaving issue.

John Penza and James Vincent Penza became physicians and neither of them ever married. Their brother, Thomas D., became a dentist. He was married and divorced prior to 1936. He had no issue.

Biagio's son, Anthony, died in April 1932, survived by his two children, William and Rosalie. Biagio's wife, Rosalie, died in 1934.

Biagio died on April 7, 1939. He was survived by his three unmarried sons, John, Thomas D. and James Vincent; his three married daughters, and by Anthony's two children, William and Rosalie. He, Biagio, left a will dated November [sic], 1936, upon which letters testamentary were issued by the Register of Wills of Philadelphia to his son, John, to whom he bequeathed his entire estate "absolutely and forever," and explained therein why he made no provision for his other children, as follows:

"SECOND. All the rest, residue and remainder of my estate, both real and personal, I hereby give, be-

queath and devise unto my beloved son, Dr. John Gennaro Penza, and his heirs, absolutely and forever. In making such bequest and devise to my son, Dr. John Gennaro Penza, to the exclusion of my other children, I am actuated that I have, during my lifetime, given all my other children sums of money and other things of value which in my judgment adequately represent what I could have left them after my death if I had not anticipated them the said monies and things of value during my lifetime." The will was offered for probate by Claude O. Lanciano, Esq., on August 18, 1939, representing John G. Penza, executor. Mr. Lanciano filed an inventory listing personal property in Biagio's estate in the amount of $1,450, and real property of $28,300. Inheritance tax was paid on these assets.

John G. Penza, son of Biagio, died on July 18, 1946, leaving a will dated October 4, 1945 (prepared in the office of Barnes, Dechert, Price, Smith and Clark), leaving $25,000 legacies to his sisters, Adelinda Aversa and Almerinda Monticelli, and gave the remainder of his estate to his youngest brother, James Vincent Penza. In his will, John explained that he made no provisions for his brother, Thomas, because he was well able to provide for himself and that he made no provision for his sister, Chlorinda Spinelli, the third surviving sister, because he had aided her during his lifetime.

Chlorinda Spinelli filed a caveat to the probate of John's will, and letters of administration pendente lite were granted by the Register of Wills of Philadelphia to Charles L. Guerin, Esq., and James Vincent Penza. They were represented by Claude O. Lanciano, Esq., and Paul A. Rafferty, Esq.

Prior to John's death, Chlorinda Spinelli instituted an equity action against both John and James Vin-

cent, claiming that her conveyance of six parcels of real estate to John and/or James Vincent had been made as a result of fraud and duress and that she was entitled to a reconveyance of these premises. After John's death, that litigation was successfully defended by James Vincent. The caveat to John's will was then withdrawn, an account was filed by the administrators pendente lite and letters testamentary on the estate of John Penza issued to James Vincent Penza who was represented as executor by Lester J. Schaffer, Esq. An inventory in the estate of John G. Penza was filed, showing assets valued at $274,000, and Mr. Schaffer arranged for the payment of the inheritance tax on the full value of these assets.

Thomas D. Penza died on January 12, 1964, leaving a will upon which letters testamentary were granted by the register of wills to James Vincent Penza, executor, to whom he bequeathed his entire estate having a gross value of $27,000.

Almerinda (Minnie) Monticelli divorced her husband in 1947 and, at the invitation of her brother, James, moved into his home with her two children, Mario and Yolanda. Almerinda died in November 1964.

Chlorinda Spinelli, survived her brother, James. She died January 12, 1969, survived by her three children mentioned above.

Claude O. Lanciano, Esq., a member of the bar of this court for almost 50 years, was called to testify by the objectors. He testified that he first met certain members of the Penza family in 1930, in connection with his duties as Special Deputy Secretary of Banking in charge of the liquidation of the Columbus Title and Trust Company, located in South Philadelphia, several blocks below the Penza family home located at 1149 South Broad Street, and not far from 921

Federal Street, the building where John, Thomas and James Vincent had their professional offices; that some time after Easter 1937, he was at the dinner table in Biagio's home at 1149 South Broad Street having dinner with Biagio and his three sons, John, Thomas and James Vincent, when Biagio was holding conversation in Italian. He testified at page 27:

"By Mr. Goffman:

"Q. Will you tell us as well as you can remember just what was said?

"A. The old gentleman stated that he wanted a certain thing done with his estate or his holdings—'mia fortuna', my fortune, is the language he used. He said, 'I want my oldest unmarried son to take everything that I have. I want him to add whatever he can add to that fortune. I want him to use it as his own and for the benefit of the rest of the family whenever they needed anything at all. However, if you, John,'— who, incidentally, never married—'become engaged to be married or married, then I want you to pass it on to my next unmarried son. And if the next unmarried son marries, then I want it passed to the third unmarried son.' That would be the last one. Tom, I discovered, had been previously married to a Miss Cancelmo. That marriage had ended in a divorce before I became acquainted with the Penzas, and I didn't know too much of the details then or now.

"Q. What was the response of Tom or John or J. Vincent to that request?

"A. John, who acted more or less as the spokesman, said that, 'If this is what you want done, pop, Mr. Lanciano is a lawyer; why don't you talk with him to see whether the thing cannot be documented in some way?' I asked to be excused. I didn't want to participate in it, particularly since I could see that the old man was getting a little bit heated. His voice rose. He was getting a little bit angry.

"BY THE COURT:

"Q. I couldn't hear you.

"A. He was getting a little bit excited. His voice rose, and he showed evidence of being irritated. So he said to the three of them, 'Do you understand what I want you to do?' And they all said, 'Yes, pop.' He said, 'All right. Don't talk to me about documents. This is what I want done. Will you do it?' They said, 'All right, we'll do it.' "

He testified that Biagio said that in the event of marriage or death of the eldest son, it was to pass to the next unmarried son in order of seniority, and on the death of the last son, the entire estate should be equally divided among the surviving members of the family or their heirs, or their issue.

Mr. Lanciano further testified:

". . . It was said in Italian, and it is quite difficult to be absolutely literal. Moreover, while I have a fairly decent memory, I can't pretend to go back all these years and remember word for word what was said. Suffice it to say, I was embarrassed to find myself in the middle of an intimate family discussion, and I didn't belong there, I wasn't brought in there professionally, and I didn't like being there under the circumstances."

The same witness further testified that about a week after this dinner conversation, he went with John, James Vincent and Thomas to Biagio's home and John said to the old man, "We brought Mr. Lanciano down. Do you want to discuss this thing a little bit further?" He said: "I don't want to discuss it any further. You know what I want. I want you to tell me now, are you going to do it or not?" They said: "All right, if you don't want to discuss it, we'll do it."

Mr. Lanciano testified that he did not make any notes of Biagio's conversations at any time, and that he first tried to recollect the conversation for Mr.

Richette about a month prior to the hearings before the register in connection with the probate of J. Vincent Penza's Will, and later in a conference which he had with counsel for the objectors. He testified that he never represented Biagio and had only a shaky recollection of having probated Biagio's will. At no time did he discuss with any member of Biagio's family any of the conversation that took place in the spring of 1937; he had no recollection of having filed the inventory in Biagio's Estate; he couldn't recall whether an account had or had not been filed in Biagio's estate. In cross-examination, counsel for the accountant pointed out to Mr. Lanciano that in his testimony before the register of wills in the caveat proceedings, he didn't mention a single word about the inclusion of assets of John, James Vincent or Thomas as being subject to the "family trust."

He testified that he was of counsel for Dr. John and Dr. James Vincent from the beginning to the end of the litigation instituted by their sister, Chlorinda, and in the settlement of the John G. Penza Estate, but he had no recollection of being present at the audit of an account in John's estate, and testified that he had no occasion to bring to the court's attention the existence of any trust created by Biagio Penza.

The objectors also called Lester J. Schaffer, Esq., to testify in support of their claim. Mr. Schaffer, an experienced trial member of the bar, testified that he first became acquainted with the Penza family when his law firm was engaged in 1946 to represent James Vincent Penza and John Penza in connection with the equity action instituted by Mrs. Spinelli. After John's death in July 1946, he became acquainted with John's estate because of its tax problems, and he also represented James Vincent Penza in connection with a criminal indictment against James Vincent arising

out of certain bankruptcy proceedings; he never knew Biagio Penza; he testified that during the course of these various representations he discussed with the Penza brothers, John, Thomas and James Vincent, the family financial matters and the handling of the family property; that in 1946, John, in the presence of James Vincent, stated that "their father had evolved a plan for the distribution of his estate with the idea that Dr. John would be the first heir of Biagio's estate, and then the estate would go through the line down through the brothers"; he specifically testified that he did not recall any discussion about the inclusion of property of any one other than Biagio Penza.

Mr. Schaffer testified that after John's death he had further discussions with James Vincent and with Thomas, and James Vincent told him that Tom "was not the most conservative person in the world" and that his, John's estate, might be dissipated if left to Tom, and, therefore, John left his estate to James Vincent and not to Tom "to carry on the plan" for the estate to go through the line down through the brothers.

"Q. And will you tell us what he (Dr. James Vincent) said that plan would be, or was to be, after the death of the last of the brothers?

"A. That the estate was to be divided. J. Vincent said that the Biagio plan was for the estate to be divided among the surviving children or the children of the surviving children."

He testified that he made no notes of his discussions with James Vincent and Tom and that since the 1946 discussions with the Penza brothers as to their father's plans, he didn't discuss those plans with anyone until just before his testimony before the register of wills.

"Q. In your conversations at any time with any of

the sons of Biagio Penza was any reference made by any of them to the desire of Biagio Penza to have his estate descend eventually after the death of all of his sons to his daughters and their descendants?

"A. I thought that was the plan."

Mr. Schaffer then testified that he was in error when he testified before the register of wills in the caveat proceedings that it was his understanding at that time that James Vincent would be the ultimate beneficiary of John's estate with equal distribution after James' death "among the sisters and the heirs of any deceased sister."

Adelinda Aversa, a daughter of Biagio's, and claimant to one-fourth of the distributable estate, testified subject to the objections of the accountant under the Dead Man's Act. She testified that one evening during the summer of 1936, she was present at her father's summer home in Wildwood Crest, N.J., when her three brothers were visiting, and her father discussed with her brothers in Italian what was to happen to his property after his death. She testified that her parents came to this country in 1888 or 1889; Almerinda was born here in 1890; her brother Tom was born in 1892, and James Vincent was born in 1895, and she was born February 5, 1900; that on this occasion in the summer of 1936, her father said:

". . . Well, we are all here today, all together, and I would like you to know that all my estate and my moneta . . . I want this all to go to John, he being the oldest and unmarried son of the family; and . . . then it is to go down the line to the next unmarried son who would be Vincent, because Tom was already married, and from Vincent on it was to go to the remaining heirs, or the sisters living, and to the grandchildren—my grandchildren . . . my dad's grandchildren, and it was to be divided equally."

And she testified that was the entire conversation, and that the same subject was discussed around Christmas of 1936, when her father handed her brother John an envelope and said, " 'This is my will' and he said, 'Now remember when I said to you three, when we were at the shore, that I want my estate, putta la fortuna la mia moneta, is to go to John, he being . . .' and he repeated the same thing he said when we were down at the shore, that is to go to John, he being the oldest and unmarried, and then it was to be handed down to Vincent, unmarried . . ." She testified that her father could not read or write English and that he spoke in Italian.

William Penza, a grandson of Biagio's, who claims one-eighth of the distributable estate, testified that he continued to visit his grandfather, Biagio, after the death of his father, Anthony Penza; he had no knowledge of any family trust.

Yolanda C. Monticelli, the executrix, was called by the objectors and later she was called to testify by her own counsel. She testified to her frequent contact with her grandfather, Biagio, and with her uncles and aunts, and testified she never heard of any family trust.

Mario Monticelli, a brother of Yolanda's, testified he never heard of any family trust.

Mary Tomasco, a witness called by the objectors, testified she typed and witnessed Biagio Penza's signature to his will; that she had no discussion with Biagio Penza concerning any Italian custom, and that she typed the will at the direction of her supervisor at the bank just as she typed about 100 other wills; that it was a custom among Italians that money and property or whatever they had was to be left to the oldest *son or daughter* with the intention that it would be used to take care of the remaining mem-

bers of the family; that she typed Biagio's will on November 16, 1936, and she and her boss, Mr. Chuirco took the will over to Biagio Penza's home where Mr. Chuirco translated it to Biagio in Italian and it was then executed and witnessed.

## DISCUSSION

The testimony of Adelinda Aversa was objected to by counsel for the accountant as being prohibited under the so-called Dead Man's Act of May 23, 1887, P. L. 158 §5, clause (e), 28 PS §322. However, I find that insofar as her testimony related to the existence of a trust, it was merely corroborative of the testimony of Messrs. Lanciano and Schaffer. Were I as the auditing judge to place any reliance upon it as to the existence of an express trust, or the exact terms thereof, I believe my action would be in violation of the Dead Man's Act. I cannot, therefore, credit her testimony as of any benefit to the objectors . . .

The chancellor is not convinced that there is here sufficient evidence to indicate that Biagio's three sons, who in 1936 and 1937 were in the prime of their professional careers, agreed to add their own estates to their father's even though their father may have tried to press it upon them. The immigrant father may have expressed a *hope* or expectation that his sons would assume his responsibilities to the other members of his family and gave his property to his oldest son on such expectation, but this is inconsistent with the will which he executed.

I find, that the testimony of the several witnesses is not of the "clear, positive and convincing" quality which is prescribed by the authorities cited to prove the constructive trust that the objectors seek to establish.

My careful review of the testimony of Mr. Lanciano

and Mr. Schaffer, two completely disinterested witnesses, convincingly establishes that Biagio's three sons, John, Thomas and James Vincent, sometime in 1937, agreed to their father's demand, that they, the oldest unmarried of them in turn, would hold their father's "fortuna" after his death, for the benefit of his "family." However, the testimony is equivocal, dubious and conflicting as to the claim that the sons were to add their own property to that of their father's to be passed on to his children and issue, or to Biagio's daughters and their issue, or in what proportion his property was to be distributed on a per capita or per stirpes basis. There is also uncertainty here as to whether distribution must await the death of all three sons, or whether partial distribution might be made on the basis of need in the lifetime of the various members of the family. It is elementary in establishing a private trust that both the beneficiaries and the res be clearly set forth. A court can always supply a trustee, and in a charitable trust it can cy pres a beneficiary. In no trust can the court supply the res, and in a private trust the beneficiary or beneficiaries must be clearly defined.

A leading case in Pennsylvania on secret or constructive trusts is Church v. Ruland, 64 Pa. 432 (1870). A father devised realty to his daughter, Letta, in fee, on her oral promise that after her death one-half of the property would go to the children of Charles Stevens, of whom plaintiff Ruland was one. Letta died without having devised any of the realty to the plaintiff who brought an action of ejectment against Church, to whom Letta had devised the realty. Judgment was entered on a verdict for the plaintiff. . . .

Church v. Ruland well illustrates the principle of Restatement 2d, Trusts, §55 (1). There was in that case a wealth of oral testimony to determine the exact

provisions of the oral trusts. The case also demonstrates the proper application of the five-year statutory bar contained in section 6 of the Act of April 22, 1856, P. L. 532, 12 PS §83.

Here, there is little or no evidence of any fraud on the part of Biagio's three sons. Objectors are entitled to equitable relief, however, in order to prevent unjust enrichment. Thus, Restatement, Restitution §186 (1), provides in words almost identical to §55(1) of the Restatement of Trusts:

"(1) Where a testator devises or bequeaths property to a person relying upon his agreement to hold the property in trust for or to convey it to a third person, the devisee or legatee holds the property upon a constructive trust for the third person."

This is the law in Pennsylvania: "There is, however, a line of cases where a trust will be constructed on proof of a promise by the legatee to the testator even though that promise did not induce the gift: Keller v. Keller, 351 Pa. 461, 41 A. 2d 547 (1945); Metzger v. Metzger, 338 Pa. 564, 14 A. 2d 285 (1940); Kauffman v. Kauffman, 266 Pa. 270, 109 A. 640 (1920); Washington's Estate, 220 Pa. 204, 69 Atl. 747 (1908). Those cases proceed not on the theory of fraud but rather on the theory of unjust enrichment: Brenneman Estate, 360 Pa. 558, 63 A. 2d 59 (1949). It is upon this latter group of cases that any claim for recovery by plaintiffs must be based.

"It is axiomatic that to prove a trust by parol the evidence must be clear, precise and indubitable: Williams Estate, 349 Pa. 568, 37 A. 2d 584; Moffitt v. Moffitt, 340 Pa. 107, 16 A. 2d 418; Rocks v. Sheppard, 302 Pa. 46, 152 A. 754. In the Metzger case, supra, and the Kauffman case, supra, the trust relationship was admitted by defendant in open court. In Washington's Estate, supra, a letter, written by the legatee,

admitted the existence of a trust. And in Keller v. Keller, supra, it was found as a fact from the testimony that defendant had told plaintiff he had been given the money for her but wasn't going to give it to her at that time. Thus, in those cases, and in all others that we have been able to discover where recovery was allowed when the element of inducement was lacking, the clear, precise and indubitable proof was furnished by the legatee's own admission of the promise": Danner v. Danner, 366 Pa. 178, 180-81, 77 A. 2d 217 (1950).

Here, we have a definite promise by Biagio's three sons to hold Biagio's estate in trust for the family as testified to by Mr. Lanciano. We have their later admission of the same trust to Mr. Schaffer. What is lacking in the objectors' case is a definite res or corpus, a definitive identification of the beneficiaries, and a clear-cut period of duration, i.e., could corpus be invaded during the lifetime of the three brothers?

The auditing judge finds the present situation strongly analogous to the explanatory comment on section 186 of the Restatement on Restitution:

"e. Designation of beneficiary. Where the devisee or legatee or heir or next of kin agreed with the decedent to hold the property in trust for or to convey it to such person as the decedent might thereafter designate, and the decedent does not during his lifetime inform him of the identity of the intended beneficiary, he will not hold the property upon a constructive trust for the intended beneficiary. In such a case the devisee or legatee would be unjustly enriched if he were permitted to retain the property, and therefore he will be compelled to hold it upon a constructive trust for the estate of the decedent. . . ."

In view of the foregoing, I find as a fact that Biagio Penza bequeathed and devised his entire estate to his oldest son, John, upon the oral promise of John,

Thomas and James Vincent Penza that each of them, in turn, would hold Biagio's estate for the benefit of Biagio's "family."

I further find as a fact that the evidence of the objectors as to the beneficiaries, the res, and the duration of the trust falls short of the required standard of "clear, precise and indubitable" evidence.

I conclude, therefore, as a matter of law that Biagio's estate was erroneously distributed to his son, John Penza, as his sole testamentary heir, instead of being equally divided among Biagio's six surviving children and the two children of his deceased son, Anthony.

I hold that that portion of the estate of James Vincent which can now be traced to the estate of Biagio through John Penza's estate must now be divided into seven equal shares. Adelinda Aversa and the estates of Chlorinda Spinelli, John, Thomas and Almerinda Monticelli are each entitled to an equal one-seventh share. William and Rosalie Penza are each entitled to an equal one-fourteenth share. The estate of James Vincent is to retain three equal one-seventh shares, inasmuch as he was entitled to his own share as well as the shares to which he is entitled as the heir of the estates of his two brothers, John and Thomas.

The register of wills' records of the estate of Biagio Penza, John G. Penza, Thomas D. Penza and J. Vincent Penza were admitted into evidence. . . .

The records of the register of wills pertaining to Biagio Penza's estate which were admitted into evidence show an inheritance tax return which allowed deductions in the sum of $1,737.30 for Biagio's funeral expenses, counsel fee, commission against a Pennsylvania taxable estate of $29,750 or taxable estate of $28,612.70, on which inheritance tax was assessed at two percent in the sum of $572.25 and paid. In addition, a New Jersey inheritance tax was paid in

the sum of $42.50 on the basis of a return on premises 123 East Crocus Road, Wildwood Crest, at a value of $4,500.

I find as a fact that Biagio's son, John, paid all of the debts and charges listed in the inheritance tax affidavit in Biagio's estate amounting to $1,737.30 and the Pennsylvania inheritance tax thereon in the sum of $572.25, and the New Jersey inheritance tax of $42.50, a total of payments aggregating $2,352.05. The $500 cash inventoried in Biagio's estate was consumed by John on account of the payment of these charges, leaving the sum of $1,852.05 paid by John G. Penza to be set off against the trust assets which he took from his father, under the will, subject to the "family" trust.

Since the chancellor has found that both John and James Vincent Penza were trustees in turn of their father's "family plan," each one was under a duty to account for such assets of Biagio as came into his hands. No separate accounting by either brother was produced to the court. Where the parties have been unable to trace the various items composing Biagio's estate, or the conversion thereof, it is assumed that these assets or the proceeds were commingled with the individual property of the respective trustee. Since each trustee failed in his duty to account, the law of Pennsylvania affords a remedy by way of damages. Section 3544 of the Probate, Estates and Fiduciary Code reads as follows:

"§3544. Liability of personal representative for interest

"A personal representative who has committed a breach of duty with respect to estate assets shall, in the discretion of the court, be liable for interest, not exceeding the legal rate on such assets."

Section 7183(11) states that the liability of a trustee

for interest shall be "as in section 3544 (relating to liability of personal representative for interest)." The source of these sections of the code may be traced through sections 754 and 983(11), of the Fiduciaries Act of 1949 to section 44 of the Fiduciaries Act of 1917. . . .

Here, likewise, the chancellor takes judicial notice that at the time of Biagio's death investments were bringing considerably less than six percent per annum. During recent years, the rate of returns on investments has greatly increased and the legislature has even raised the legal rate of interest in some restricted instances to nine percent: Act of July 24, 1970, P. L. 632, 41 PS §3. Since bad faith on the part of neither John nor James Vincent has been shown in this case to the satisfaction of the chancellor, he believes that it would be unjust to assess damages at a rate which equals the legal rate. In the opinion of the chancellor, the imposition of a three percent rate would do equity to all parties. . . .

No evidence was submitted to show that any part of the Delaware County real estate inventoried and accounted for in the estate of J. Vincent Penza or other assets inventoried in his estate ever formed a part of Biagio's estate, or were derived by J. Vincent or by John as a result of the conversion by either of them of any of Biagio's assets. I, therefore, find as a fact that the two parcels of real estate in Delaware County referred to in the stipulation as parcels "A" and "B" do not form any part of Biagio Penza's trust estate.

The claim of the objectors on behalf of the next of kin of the estate of Biagio Penza, deceased, is allowed as above. Awards will be made accordingly . . .

The account shows a balance of principal, personalty of $26,104.99

and principal realty unconverted       412,203.08
and income personalty       17,837.11
and income realty       3,376.90
together       $459,522.08
which, composed as indicated in the account, together with income and interest since received, subject to such inheritance tax as may be due and assessed, without prejudice to the claim of Arnetta Dorsey, as above, is allowed to the next of kin of Biagio Penza, deceased, the fractional shares as indicated above, to be reflected in the schedule of distribution hereinafter directed to be filed, and the balance, principal and income, to Yolanda C. Monticelli . . .

And now, September 13, 1972, the account is confirmed nisi.

*Joseph J. Frieri, J. Pennington Straus, W. Bradley Ward for Schnader, Harrison, Segal & Lewis,* for accountant and Yolanda C. Monticelli, as sole residuary legatee.

*Lawrence J. Richette, H. Robert Fiebach* and *Louis J. Goffman,* for objectants.

*Paul M. Goldstein,* for Charles Sunderland, plaintiff in Sunderland v. Monticelli, Executrix of Est. of James Vincent Penza.

*Albert Bartolomeo* and *Catherine G. Barone,* for Commonwealth.

## OPINION SUR EXCEPTIONS

KLEIN, A. J., January 12, 1973.—The late Mr. Chief Justice Drew, speaking for a unanimous court, said in Danner v. Danner, 366 Pa. 178, 180, 77 A. 2d 217 (1950):

"The gift or bequest of an absolute interest subject to an orally imposed condition has long been a subject of litigation in this Commonwealth. Out of the wealth

of cases certain principles have become firmly established. It is clear that where a legacy is *induced* by the legatee's promise to hold it for the benefit of another or where the legatees' promise *induces* the testator not to change his will, a constructive trust will be erected: Hollis v. Hollis, 254 Pa. 90, 98 A. 789; Blick v. Cockins, 234 Pa. 261, 83 A. 196; Jones v. McKee, 3 Pa. 496 . . .

"There is, however, a line of cases where a trust will be constructed on proof of a promise by the legatee to the testator even though that promise did not induce the gift: Keller v. Keller, 351 Pa. 461, 41 A. 2d 547; Metzger v. Metzger, 338 Pa. 564, 14 A. 2d 285; Kauffman v. Kauffman, 266 Pa. 270, 109 A. 640; Washington's Estate, 220 Pa. 204, 69 A. 747. Those cases proceed not on the theory of fraud but rather on the theory of unjust enrichment: Brenneman Estate, 360 Pa. 558, 63 A. 2d 59 . . ."

In Sechler v. Sechler, 403 Pa. 1, 169 A.2d 78 (1961), Mr. Justice Benjamin R. Jones (now Chief Justice) in speaking of the quantum of proof necessary to establish such a trust, said, at page 7:

"Basic in our approach to the second factor, i.e., the standard of proof required is the rule: 'It is axiomatic that to prove a trust by parol the evidence must be *clear, precise and indubitable*'; Danner v. Danner, 366 Pa. 178, 180, 77 A. 2d 217. In Moffitt v. Moffitt, 340 Pa. 107, 110, 16 A. 2d 418, we had previously said: 'Evidence to support a parol trust must be *direct, positive, express, unambiguous and convincing:* [citing cases].' Unless the evidence equates this standard a parol trust cannot be established. The reason for the rule is evident: unless the evidence of the existence of an oral trust is of the highest probative value, equity should not act to convert an absolute owner-

ship into an estate of lesser quantity." (Italics supplied.)

We are in complete agreement with the auditing judge that the claimants have failed to meet the heavy burden which the law imposes upon them to establish by parol the creation of a constructive trust under the provisions of which James Vincent Penza, the decedent, agreed to add his own estate to that of his father, Biagio Penza, for the benefit of the father's family.

However, in our opinion, the conclusion of the auditing judge that section 186(e) of the Restatement, Restitution, provides a solution by holding the decedent a constructive trustee of the property which originally belonged to Biagio Penza for the benefit of Biagio's intestate heirs is not entirely free from doubt.

The determination of whether a trust has been created by parol is, in a large measure, a factual question. "In reviewing the evidence to determine the existence of a trust the situation of the settlor and the beneficiary, financial and otherwise, their relation to each other as well as the purpose for which the trust was created, and circumstances under which it is to be administered must be given due consideration. All the evidence and surrounding circumstances must be considered as an entirety; . . .": Keller v. Keller, 351 Pa. 461, 464, 41 A. 2d. 547 (1945). If we were the triers of the facts in the present case, we might perhaps have reached a different conclusion. Nevertheless, we are not disposed to disturb the findings of the auditing judge because of the firmly entrenched rule that the credibility of witnesses and the weight to be given to their testimony can be much better determined by the judge who hears and sees them. The findings of fact by a hearing judge will not

be disturbed unless we find that there was manifest error or clear mistake. We are not prepared to so find under the bizarre circumstances of this case. See the many cases cited on this subject in 4 Hunter O.C. (2d ed.), Orphans' Court, 17(a), page 393.

In our opinion, the other questions raised by the various exceptions filed by the parties are without merit.

Accordingly, the exceptions are dismissed and the adjudication is confirmed absolutely.