In re PEMAQUID UNDERWRITING
BROKERAGE, INC., Debtor.

Pemaquid Underwriting Brokerage,
Inc., United Messenger Courier Program and John T. Simon, Plaintiffs,

v.

D & H Alternative Risk Solutions, Inc.,
Valley National Bank, Cunningham
Lindsey Claims Management, Inc.,
and XYZ Corp. (fictitious entities),
Defendants,

v.

Legion Insurance Company (in
liquidation), Interpleader
Defendant.

Bankruptcy No. 04–19537 MS.
Adversary No. 04–2402 MS.

United States Bankruptcy Court,
D. New Jersey.

Jan. 12, 2005.

Andrew L. Indeck, Esq., Scarinci & Hollenbeck, LLC, Lyndhurst, NJ, Attorneys for Plaintiffs, Trustee for Pemaquid Underwriting Brokerage, Inc., United Messenger Courier Program and John T. Simon.

Charlotte E. Thomas, Esq., Wolf, Block, Schorr and Solis–Cohen, LLP, Cherry Hill, NJ, Attorneys for Interpleader Defendant, M. Diane Koken, Insurance Commissioner of the Commonwealth of Pennsylvania as Statutory Liquidator of Legion Insurance Company and Villanova Insurance Company.

## OPINION

MORRIS STERN, Bankruptcy Judge.

Here, the substantive question on cross-motions for summary judgment is the own-

ership of certain bank accounts (the "Imprest Accounts"). These accounts are claimed, on the one hand, by the Chapter 7 bankruptcy trustee of a debtor-insurance broker *and* a partnership comprised of that broker and another nondebtor, and, on the other hand, by the Commissioner of Insurance of the Commonwealth of Pennsylvania, as liquidator of the defunct Legion Insurance Company.

In a turnabout from more familiar fact patterns, *sub judice* it is the trustee in bankruptcy who asserts that the bank accounts at issue were only nominally Legion's (now only nominally in the estate to be liquidated by the Commissioner). As the trustee would have it, the equitable interest in the accounts belonged to Pemaquid and the partnership. The Imprest Accounts, by this contention, would become property of the bankruptcy estate per 11 U.S.C. § 541(a) (to be then allocated between the estate and the partnership which includes the debtor). Equitable remedy is sought by the trustee and his co-plaintiffs, including the imposition of trust concepts. They also assert contractual entitlement. The Commissioner resists, arguing that her estate in liquidation pursuant to Pennsylvania law and her appointment by the Commonwealth Court includes the Imprest Accounts, which were plainly opened in Legion's name and were under its control.

This adversary proceeding originated as a civil action in the Superior Court of New Jersey. Plaintiffs, Pemaquid Underwriting Brokerage, Inc. (now the debtor in an ongoing Chapter 7 case), United Messenger Courier Program (United, purported to be a partnership of Pemaquid and John T. Simon), and Simon, filed their complaint on January 19, 2004. Plaintiffs sought a determination of rights to the Imprest Account balances,[1] but did not name Legion or the Commissioner as defendants. Instead, certain intermediaries with operational access to the accounts were the original defendants.[2] One defendant then interplead by both counterclaim and third-party complaint (which brought the Commissioner into the case as Legion's liquidator).[3]

On March 22, 2004, the debtor filed its bankruptcy petition. Pursuant to 28 U.S.C. § 1452, the trustee filed a Notice of Petition of Removal on or about June 18, 2004. The proceeding was then referred

1. The Imprest Accounts are the New Jersey account # 04084190–1 opened in Legion's name in conjunction with D & H Alternative Risk Solutions, Inc. at Valley National Bank, with a current balance of $599,686.07 (*see* D10, Exhibit R, pp. 5 and 6 and Exhibit S; and D16); and, the Texas account # 3860–2277 opened by Cunningham Lindsey Claims Management, Inc. at an unstated bank, with a current balance of $508,167.93 (CL's authority derived from D & H's contractual relationship with Legion, D3, Exhibit D 5.1 and 5.2, allowing for such service companies to utilize the account) (*see also* D16).\*

\*Document references "D" are to numbered entries in the docket in this Adversary Proceeding.

2. The named defendants were: D & H Alternative Risk Solutions, Inc. ("D & H"), a claim servicing business which along with its affiliate, Dietz and Hammer ("Dietz"), had contracted with Legion Insurance Company to provide adjusting and administrative services; Cunningham Lindsey Claims Management, Inc., a subcontractor to D & H with respect to Legion services; and, a New Jersey bank which held certain deposit accounts including some Imprest Accounts. D & H and Cunningham maintained certain operational control of one or another of the Imprest Accounts. The bank has since been dropped from the case.

3. Legion's demise resulted first in a Pennsylvania Commonwealth Court Order of March 28, 2002, the "Rehabilitation Order," and then a "Liquidation Order" of July 28, 2003 (D3, Exhibits A and B, respectively).

to this Court by the District Court.[4] This Court has jurisdiction, as well, in accordance with 28 U.S.C. § 1334 and the Standing Order of Reference of the United States District Court of New Jersey dated July 23, 1984. The parties contend that this is a core proceeding within the meaning of 28 U.S.C. § 157(b)(1) (*see* 28 U.S.C. § 157(b)(2)(A)(E) and (O)). They have stipulated and agreed that it should be treated as core. Given that stipulation and this Court's conclusion that, as a minimum, the proceeding is "related to a case under title 11" per 28 U.S.C. § 1334(b), this Court will enter judgment.

Summary judgment is appropriate in this case. Basic facts are not in dispute, though conclusions to be drawn from a volume of contracts are at issue. A substantial documentary record, including contracts and certifications, has been developed. Judgment can be rendered on the record, since questions of law can be decided on either undisputed facts or facts read most favorably against the successful judgment proponent. Triable issues are thus obviated. *See* FED.R.CIV.P. 56 and FED. R. BANKR.P. 7056.

### Facts

The Pemaquid–Legion relationship drew the other named defendants into this proceeding. It also implicated offshore enterprises, one of which was the parent of the domestic insurer, Legion. That Bermuda-based parent, Mutual Holdings Bermuda Ltd. ("MH" or "Mutual"), has offshore subsidiaries which include workers compensation reinsurers Mutual Indemnity Ltd. of Hamilton, Bermuda ("MB") and Mutual Indemnity (Barbados) Ltd. of Bridgetown, Barbados ("MBar").

In simplest terms, the "rent-a-captive" program implicating Pemaquid, Legion and others was a device by which Pemaquid and United could "bundle" their clients as insureds, and cover those clients with law/regulation compliant workers compensation insurance through a duly licensed insurer, which in turn would look for coverage to its offshore reinsurer—while Pemaquid held the reinsurer harmless with respect to the ultimate risk of underwriting losses. Pemaquid and United, rather than the licensed insurer, were to garner any underwriting profit. The insurer and reinsurer were to receive commissions. The business initiators (again, Pemaquid and United) were to indemnify the offshore reinsurer against underwriting loss. Theoretically, premiums would account for all claim payments, program expenses and commissions, and the remaining profit (including a share of the investment income on the pooled premium-generated funds) would inure to the business initiators. Hence, the risk-reward characteristics of insurance would be reversed as between the licensed insurer (now a "captive") and the broker/agent. Of course, much of the mechanics of such a reversal of interests was designed to achieve technical compliance with applicable insurance regulation which, among other requirements, plainly dictates that *insureds* be protected.

Thus, from Pemaquid's perspective the arrangement had its regulated and more conventional insurance attributes (referred to here for convenience as the "Insurance Mechanics"), and its investment attributes ("Investment Mechanics").

As to the Insurance Mechanics, the fundamental document was the Legion-issued workers compensation policy (the "Policy" or "Policies") covering insureds produced by Pemaquid as broker and/or agent. Accordingly, pursuant to a certain *Management Agreement* (D3, Exhibit F) (the

---

4. Order of August 10, 2004(D2).

"MA"),[5] Pemaquid was appointed Legion's manager to procure, underwrite and service "Worker's Compensation and Employer's Liability written under the New Jersey Workers' Compensation Safety Group Pool Program" (MA, Section 2A).

Pemaquid had no claims authority (MA, Section 4C) and no capacity to "bind reinsurance or retrocession" on behalf of Legion (MA, Section 4D). Pemaquid served as an independent contractor with no employee/employer relationship with Legion (MA, Section 24). It was not authorized to appoint a "sub-managing general Manager" (MA, Section 4H). Pemaquid was required to remit all premiums to Legion, *whether collected or not* (MA, Section 9A), and to hold the premiums in a fiduciary capacity for Legion. The manager thus had no interest in the premiums, and was to make no deduction from them other than for Pemaquid's commission (MA, Section 9D). In addition, Pemaquid was required to refund the proportionate share of its commission on canceled policies or reduced premiums (MA, Section 17B).[6]

The Insurance Mechanics also included the *Brokerage Agreement* between Legion and Pemaquid (D3, Exhibit G) (the "BA") with multiple Addenda showing the remuneration due Pemaquid from Legion for contract years beginning February 1, 1996 and extending through February 2, 2001. As a broker, Pemaquid was "a representative of the Insured and not the agent or representative of Legion" (BA, Section C). Like the Management Agreement, the Brokerage Agreement also required Pemaquid to *"remit to Legion all premiums whether or not collected"* (BA, Section B1) and allowed Pemaquid a commission on premiums (BA, Section D).[7]

The *Reinsurance Agreement* (the "RA") was another fundamental of the Insurance Mechanics. This was a preexisting agreement between Legion as insured and its offshore affiliate reinsurers, MB and MBar. It was dated September 8, 1988, effective January 1, 1988 (D5, Exhibit 1, Subexhibit C). The agreement refers to MB and MBar as a single party, "the reinsurer." Per the RA, Legion was permitted to *cede* to the reinsurer "a portion of [Legion's] liability" attributable to the Policies. This type of reinsurance is known in the industry as a "treaty." *See North River Ins. Co. v. CIGNA Reins. Co.,* 52 F.3d 1194, 1199 (3rd Cir.1995). The reinsurer received a premium for this undertaking, which in RA terms is the "Net Premium Paid" (Article II 5); the parties agree that it was Policy premium net of certain commissions and other deductions which flowed "upstream" from Legion to the reinsurers (D15 ¶ 12 and D5 ¶ 12 and 13). "Downstream" flow necessary to meet the ceded liability obligations was provided for by the RA as follows (Article IV 1):

---

**5.** The MA was signed May 5, 1997 but was rendered effective as of February 1, 1996.

**6.** Pemaquid, as manager, was allowed a Base Commission of twelve percent of Gross Collected Premiums (less returns and cancellations) for policies commencing February 1, 1996 through January 1, 1997 and a Base Commission of fifteen percent of Gross Collected Premiums (less returns and cancellations) for policies commencing January 1, 1997 through January 1, 1998 (MA, Addendum 1 and Addendum 2). Section 18 of the MA entitled "Contingent Profit Commission"

contains only the statement "This Section intentionally left blank" (MA, Section 18).

**7.** The broker commissions due Pemaquid ranged from twelve percent of Gross Written Premium for policies effective February 1, 1996 through January 1, 1997 to twenty-three percent of Gross Collected Premiums for policies effective February 1, 2001 through February 1, 2002. Pemaquid was required to return to Legion unearned commission on canceled policies (BA, Section D3).

[Legion] will, with funds to be provided by the Reinsurer, establish and maintain a Paid Loss Deposit Fund, the purpose of which is to provide a source of funds for payment of the Reinsurer's liability under this Agreement.

The *Paid Loss Deposit Fund* was to be maintained generally in an amount equal to an average two months' paid losses. ("Paid losses" were those paid by Legion, Article II 3.) The reinsurer's liability followed that of Legion; that is, all settlements by Legion bound the reinsurer (Article III 1).[8] If Legion became obligated to pay a claim which exceeded the balance in Legion's Paid Loss Deposit Fund, the reinsurer was to send Legion the necessary amount on written demand (Article IV 2). *It is the Paid Loss Fund which the trustee now equates with the Imprest Accounts; the Commissioner disputes this point, asserting that the Paid Loss Fund was only a bookkeeping entry, not a specified bank account.*

A last component of the Insurance Mechanics was two *Three Party Claims Beneficiary Agreements* (the "TPAs").[9] As the Management Agreement stated, Legion granted Pemaquid no authority to settle claims. Through the TPAs, Legion engaged D & H and Dietz to service and settle claims on its behalf. The relationship of the servicing companies (D & H and Dietz) to Legion was similar in each TPA. The D & H TPA required D & H to "[i]nvestigate and adjust, settle or deny" all claims and allowed D & H to engage or to hire outside help (TPA–D & H, Sections III 3.2(b) and (c)). It also required D & H to "[m]ake timely payments of valid claims . . . out of funds provided by [Legion] . . ." (TPA–D & H, Section III 3.2(f)). Section V, "Draft Authority and Issuance," described the source of the funds which D & H was to use to pay claims:

> [D & H] shall have authority to draw upon a bank account (the "Loss Payment Account") which shall be established for use in payments of claims. . . . The Loss Payment Account will be replenished monthly by [Legion] upon receipt of required monthly accountings as set forth in paragraph 7.1 . . . [Legion] may review the adequacy of the account at any time and increase or decrease the account as necessary. [D & H] shall be required, upon the request of [Legion], to remit promptly any funds in the account in excess of the required amount as determined by [Legion].

(TPA–D & H, Section V 5.1). *The Loss Payment Accounts established under the TPAs are the Imprest Accounts here at issue.* The adjuster was responsible for balancing the Loss Payment account (Section V 5.4), and was given certain check-

---

8.

[T]here are significant differences between primary insurance and reinsurance. . . . In a reinsurance contract, one insurance company (the "ceding insurer" or the "reinsured"), cedes all or part of the risk that it has underwritten pursuant to an insurance policy or polices [sic] to another insurer (the "reinsurer"), in return for a percentage of the premium. . . . A reinsurance contract confers no rights on the insured. . . . In fact, the reinsurer is not directly liable to the insured. . . . The reinsurer's only obligation is to indemnify the ceding insurer on the risk transferred.

*British Ins. Co. v. Safety Nat'l Cas.*, 335 F.3d 205, 211–12 (3d Cir.2003) (internal citations and footnote omitted).

9. One was among Legion, Pemaquid, and D & H Alternative Risk Solutions (D3, Exhibit D, Three Party Claims Servicing Agreement, signed August 29, 1997, effective January 1, 1997); and a second TPA was among Legion, Pemaquid, and Dietz & Hammer (D3, Exhibit E, Three Party Claims Servicing Agreement, signed October 7, 1999, effective August 14, 1999).

signing authority (TPA–D & H, Sections V5.1 and 5.2).

The Reinsurance Agreement, a component of the Insurance Mechanics, also served as part of the Investment Mechanics. But the centerpiece of the Investment Mechanics was two *Shareholder Agreements*. Both Shareholder Agreements were dated February 1, 1996. One, naming Pemaquid as "Shareholder" (D8, Exhibit A, "SA–P"), was amended five times through May 15, 2001; the second, naming United Messenger as Shareholder (D8, Exhibit B, "SA–UM"), was amended at least twice through December 28, 2000. In each agreement MH, the parent of both Legion *and* the reinsurer, was the party contracting with the named shareholder.

Each Shareholder Agreement stated that MH allowed the named shareholder to purchase from MH one share of preferred, nonvoting stock for $1,000 *and thus to receive a dividend based on the following formula:*

2(A) the return on investment of the purchase price, net of an administrative fee;

2(B) *plus or minus* the investment *income or loss* earned by [MB, the reinsurer] under the Reinsurance Agreement through March 31 before the dividend date less an administrative fee in Appendix I and "equal to a percentage per annum of the average amount of such funds held by [MB, the reinsurer] during the preceding year." *It is understood and agreed that such funds may be held by [MB, the reinsurer] as loss reserves and premium reserves and may be repaid to [Legion] pursuant to the terms of the [RA].*

2(C) *plus or minus* the underwriting *gain or loss* realized by [MB] on the [RA] through March 31 before the dividend date. The underwriting gain as defined in 2(C) is computed as the net premium received by [MB] after all deductions made by or paid to Legion— ceding commissions, expenses, taxes, licenses, fees, assigned risk charges, guarantee funds related to Legion policies—as provided in the [RA], minus the Underwriting Fee in Appendix I and minus the cost incurred by [MB] in obtaining and maintaining the letter of credit in favor of Legion required by the [RA].

(D8, Exhibit A, emphasis added). Under this formula the payment of a dividend was essentially a function of underwriting profit. Moreover, underwriting losses became the obligation of the named shareholder (Pemaquid or United) pursuant to shareholder indemnification of MH and MB. (SA, Section 3). Collateral in the form of a bank letter of credit or equivalent was required to support this indemnification.

The plaintiffs describe certain specific business relations and the flow of premiums and claim payments relevant to Pemaquid, Legion and others, as follows:

● Pemaquid "underwrote the risk assumed by the Legion paper, put up the monies (premiums) and [was] responsible to provide collateral ... and collected premiums" (D5, Exhibit 1, ¶ 13).

● Pemaquid "put up" the premiums and sent them through Legion as a "conduit" to MB (D5, Exhibit 1, ¶ 13).

● Various "expenses" were deducted from the premiums before they were deposited with MB. These included a six-percent fee to Legion (D5, Exhibit 1, ¶ 13); an amount, initially ten percent of premium, forwarded to the third-party claims administrators (D5, Exhibit 1, ¶ 14) (D5, Exhibit 1, ¶ 13).

- The monies ultimately deposited with MB "were referred to as the 'net loss fund' and were deposited into [MB's] accounts for investment and managing;" MB was paid out of these funds for "managing the net loss fund accounts" (D5, Exhibit 1, ¶ 13).

- MB and Pemaquid/United "but not Legion were the beneficiaries of the investment income earned through MB's management of the net loss funds accounts" (D5, Exhibit 1, ¶ 13).

- Pemaquid/United and not Legion was "the beneficiary of 'underwriting profit' from the net loss fund accounts which would be paid back to [Pemaquid/United] once all claims were extinguished against the policies" (D5, Exhibit 1, ¶ 13).

- The Imprest Account included initial "seed" funds of ten percent of gross collected premiums (D5, Exhibit 1, ¶ 14); advances were later maintained "at an average of 2 months of paid losses" (D5, Exhibit 1, ¶ 15).

- Legion did not have an ownership interest in the money used to pay claims; "[a]s the issuer of the Workers Compensation policy paper, Legion did have an interest in overseeing the claims brought against the policies of insurance it issued, but did not have an ownership interest in the funds utilized to pay those claims" (D5, Exhibit 1, ¶ 14).

- Besides the initial funding from gross collected premiums, the Imprest Accounts received payments "through Legion" from the loss funds managed by the reinsurer (D5, Exhibit 1, ¶ 16).

- "Any money remaining in an imprest fund account at the close of a program, whether the program was terminated by expiration of time or any other circumstance, was returned to Pema-

quid as 'underwriting profit' " (D5, Exhibit 1, ¶ 18).

- There was no provision for money in the Imprest Accounts to go to Legion (D5, Exhibit 1, ¶ 18).

The plaintiffs' supporting submissions do not point to any passage in any agreement which describes how money would be delivered *to Pemaquid* from the Imprest Accounts; the only mechanism for an outflow from these accounts potentially to benefit Pemaquid would be through the reinsurer.

The Commissioner's counterstatement of cash flow and business relations includes the following:

- Pemaquid was compelled to remit program premiums, less only Pemaquid's commission, to Legion on a monthly basis (D15, ¶ 10).

- The entire remittance to Legion was deposited into Legion's general operating account (D15, ¶ 11).

- Under the Reinsurance Agreement, Legion remitted to the reinsurer *written premium* less (i) the ten-percent retention of written premium (presumably to initially seed the Imprest Accounts) (D15, 13), and (ii) the *ceded commission*, which included "Legion's fees, Pemaquid's fees; taxes, assessments, and specific, aggregate and catastrophic reinsurance premiums" (D15, ¶ 12).

- MB deposited the *ceded premium* which it received from Legion into MB's operating account, identifying the Pemaquid program on a bookkeeping basis (the so-called "Loss Fund") (D15, ¶ 14).

- The purpose of the Loss Fund at MB was to cover MB's reinsurance obligations to Legion. If MB's reinsurance obligations to Legion exceeded the balance in the Loss Fund, there was no underwriting profit. Under the Shareholder's Agreement, Pema-

quid had to reimburse MB for any underwriting loss, but benefited from any underwriting profits (D15, ¶ 15).

- MB had to pay Legion for losses under the Reinsurance Agreement even if MB had no money in the Loss Fund for that particular program (D15, ¶ 16).

- MB sent payment for reinsured losses into Legion's operating account and not directly into the Imprest Funds accounts (D15, ¶ 17).

"Article IV of the Reinsurance Agreement obligates Legion to establish a Paid Loss Deposit Fund 'to provide a source of funds for payment of the Reinsurer's liability.' This Paid Loss Deposit Fund is not the Loss Fund at Mutual, nor is it the Imprest Accounts at the TPA's. Rather, it is merely an accounting designation to record reinsurance funds received by Legion from Mutual Indemnity" (D15, 18).

- On April 23, 2003 the Commissioner and the reinsurer entered into a Commutation Agreement which fixed underwriting losses between them for all reinsurance obligations (covering 112 programs, including among them the Pemaquid and United Messenger programs) (D15, ¶ 19).

- In its demand from Pemaquid for reimbursement of underwriting losses pursuant to this Commutation Agreement and the Shareholder's Agreement, [MH] gave Pemaquid credit for "amounts relating to the Imprest Accounts" (D15, ¶ 23) [10].

In sum, there is general agreement between the plaintiffs and the Commissioner regarding program "upflow" of premiums and "downflow" of claim payments. More particularly, premium went from Pemaquid to Legion (less a broker or agent commission to Pemaquid). Legion would deduct its commission, an initial amount to seed claim payment availability, and expenses (including an amount to purchase "catastrophe" insurance from reinsurers outside the Mutual network), and pass the net premium to MB, the program reinsurer. MB, while placing the premium in its pooled accounts, would invest the funds and provide a periodic accounting to Pemaquid through the parent, MH. Reinsurance claims would be satisfied by MB, directly (or through reimbursement) from the funds held on account of the program, via remittance to Legion. Legion would deposit these downflow funds into its operating account and periodically transfer to the Imprest Accounts to satisfy claims. If MB held no positive balance on the program's behalf, MB would call upon Pemaquid (or its collateral) to satisfy the reinsurance obligation or to reimburse MB for its payment to Legion.

Of course, the parties have very different views of their relative interests in the Imprest Account balances and whether the insurance program generated an "underwriting profit." As to this last point, the trustee is engaged in litigation in Bermu-

10. See the August 20, 2003 letter from David Alexander, President of MB, to Pemaquid, apprising Pemaquid that its obligation was fixed at U.S. $2,014,860 but "capped" at U.S. $979,163. (D6, Exhibit Q, Sub-exhibit C). *See also* D3, Exhibit N, documenting two wire transfers of $268,113.48 and $284,145.66 from "Legion" to the New Jersey Imprest Account on dates uncertain, but each subsequent to the therein referenced "6/14/03" and "7/12/03" check register dates; these post-Commutation Agreement transfers occurred at times when MB reinsurance was no longer available to the Commissioner as Legion's liquidator. The Commissioner contends that this is proof of a disconnect between Pemaquid's claim to funds said to have emanated from MB's Loss Account, and the current Imprest Account balances.

da, where MH is suing Pemaquid and United for program underwriting losses (capped by the April 2003 Commutation Agreement between MH and the Commissioner). Pemaquid and United have counterclaimed for underwriting profit.

### Discussion

The plaintiffs seek to bring the Imprest Account balances into (and, in part, through) the bankruptcy estate. Indeed, the bankruptcy estate includes "all legal and equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).[11] To succeed, they must prove their equitable interest and that the Commissioner has only a nontitled possessory interest in or mere legal title to the accounts. *Cf.* 11 U.S.C. § 541(d).[12]

▆▆▆ Undisputed facts establish Legion as the named holder of the Imprest Accounts. The depository agreements are between the banking institutions and Legion, Legion's corporate resolutions authorized the opening of the accounts, and Legion's federal identification number is associated with them. Legion could, unfettered insofar as the banks were concerned, withdraw part or all of the account balances, and identify signatories for checks to be drawn on them. The fact that Legion named particular officers of the D & H entities and of Legion as its authorized signatories did not prevent it from exercising its discretion vis-à-vis the banks to revoke and/or alter that authority.[13] It should thus be clear that these accounts were presumptively Legion's, now succeeded to by the Commissioner. This is the case under the law of both New Jersey and Texas (the sites of the Imprest Accounts), as well as in Pennsylvania (the site of Legion's principal office and current liquidation proceeding, and the law of the TPAs, MA and RA).[14]

---

11. 11 U.S.C. § 541(a)(1) provides:
> (a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
> (1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

12. 11 U.S.C. § 541(d) provides:
> (d) Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

It is important to note that this section has no direct application to the matter *sub judice* since it is the Commissioner and not the debt-or who held legal title to (or a purported nontitled possessory interest in) the Imprest Accounts as of the commencement of the bankruptcy case.

13. The TPAs authorized both D & H and Dietz to draw upon the Imprest Accounts but provided that Legion could revoke that authority at any time on written notice, D3, Exhibit D, 5.1; Exhibit E, 5.1. The TPAs also provided that only those entities which Legion specifically authorized in writing could issue checks upon the Imprest Accounts. (D3, Exhibit D, 5.2 and Exhibit E, 5.2).

14. Article 4 of the Uniform Commercial Code, "Bank Deposits and Collections," applies in each of these jurisdictions. "Customer" is universally defined in 4–104(a)(5) of the UCC as, in pertinent part, "a person having an account with a bank." The basic relationship between a payor bank and its customer, though defined as to certain fundamentals in Subchapter 4 of Article 4, generally remains a function of the deposit agreement. *See, e.g.,* Cersonsky, "*Deposit Agreements Between Banks and Their Customers—A Wall of Protection or a Wall With a False Foundation?*", 31

The predominant case law centers on "property of the estate" concepts where claimants assert a right to *exclude* an asset from the bankruptcy estate. Structurally, that precedent requires consideration of: whether the debtor was a mere conduit for the property at issue; whether the claimant can establish a trust relationship (expressed or implied) so as to prove beneficiary status outside the estate; or, whether the equitable remedy of constructive trust should be applied. The application of this structure in inverse circumstances—where the trustee and his co-plaintiffs are attempting to *extend* the ostensible estate—requires further analysis.

More specifically to the facts of this case, the plaintiffs primarily rely on the complex and interconnected contractual relationships between and among Pemaquid/United, Legion, and the offshore Mutual companies. Does the "rent-a-captive" web establish the debtor's and its affiliate's rights to the Imprest Account balances irrespective of trust law (thus rendering Legion a mere conduit of certain funds)? [15] Does that same series of contracts establish an express or implied trust (here, i.e., a resulting trust)? [16]

*Precedential Framework*

Three cases are of particular note where, in the more usual circumstance, the bankruptcy estate is the holder of funds and a nondebtor party claims contractual or equitable entitlement to those funds. In this circuit, *In re Columbia Gas Systems Inc.* initially focused on customer refunds in the possession of a natural gas pipeline operator at the time of its bankruptcy filing. These refunds were a function of Federal Energy Regulatory Com-

TEX. TECH. L.REV. 1 (2000). *See, generally:* as to New Jersey, *All American Auto Salvage v. Camp's Auto Wreckers*, 146 N.J. 15, 24, 679 A.2d 627 (1996) (deposit of funds into general account transfers ownership of funds to bank and makes depositor the bank's creditor); *Pagano v. United Jersey Bank*, 143 N.J. 220, 233, 670 A.2d 509 (1996); *Keil v. National Westminster Bank, Inc.*, 311 N.J.Super. 473, 710 A.2d 563 (App.Div.1998); as to Texas, *Bank One, Texas, N.A. v. Sunbelt Sav., F.S.B.*, 824 S.W.2d 557, 558 (Tex.1992) ("Funds placed with a bank ordinarily become general deposits which create a debtor-creditor relationship between the bank and its depositor"; a creditor who "wants to challenge title to funds held by a third party ... should seek a writ of garnishment naming the nominal owner not the true owner"); *Whitney Nat'l Bank v. Baker*, 122 S.W.3d 204, 208 (Tex.App.2003) ("The name on the account is prima facie proof of ownership of the account" and relying on *Sunbelt Sav.* for the proposition that "[a] bank is entitled to rely on its deposit agreement when determining to whom it is indebted"); *Newsome v. Charter Bank Colonial*, 940 S.W.2d 157 (Tex.App.1997); *Overton Bank & Trust, N.A. v. PaineWebber, Inc.*, 922 S.W.2d 311, 313 (Tex.App.1996); *In re World Access, Inc.*, 301 B.R. 217, 265 (Bankr.N.D.Ill.2003); and, as to Pennsylvania, *In re Blose's Estate*, 374 Pa. 100, 103, 97 A.2d 358 (1953) (a signature card is not necessary to prove ownership of a bank account); *Caban v. Commonwealth Dept. of Public Welfare*, 60 Pa.Cmwlth. 432, 434–35, 431 A.2d 1163 (1981) (it is presumed that title to a deposit is in the person in whose name it was made).

**15.** In the more conventional circumstance, availability of nontrust-based claimant assertions to support 541(d) exclusion of equitable interests from bankruptcy estates, remains an open question in the Third Circuit. *See In re Columbia Gas Systems, Inc.*, 997 F.2d 1039, 1059 n. 7 (3d Cir.1993), *cert. denied* 510 U.S. 1110, 114 S.Ct. 1050, 127 L.Ed.2d 372 (1994); *contrast* the dissent's position at 997 F.2d at 1065–67.

**16.** The more usual incorporation of state law into 541, though reasonably clear in this case, has been overridden by the use of federal common law where federal policy dictates. *See In re Columbia Gas Systems, Inc.*, 997 F.2d at 1055–58. *Sub judice*, the law of the situs of each Imprest Account (New Jersey and Texas) is either directly applicable or influential, as is the law governing liquidation of the "rent-a-captive" licensed domestic insurer (that of Pennsylvania).

mission tariff orders. "Applying federal common law, we hold that the customer refunds ... are excluded from Columbia's bankruptcy estate under section 541(d) of the Bankruptcy Code." *Id.* at 1062.[17] To develop the applicable federal common law, the Third Circuit relied heavily on the pre-Code case *In re Penn Central Transp. Co.*, 486 F.2d 519, 523–27 (3d Cir.1973) (in banc), *cert. denied*, 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974). There, the Court "imposed an implied trust on funds held by a bankrupt debtor for another entity." *Id.* at 1059.[18] Unlike *Columbia Gas*, where FERC orders required customer refunds, the implied trust found in *Penn Central* was created by an industry–wide accounting system employed by heavily regulated railroads.

*Columbia Gas* went on to imply a trust for certain FERC-approved surcharges collected by the debtor for the benefit of a nonprofit industry research and development organization, but refused to imply a trust for "upstream" payments due gas suppliers and transporters.

The obligations owed to upstream pipelines clearly are debts. Columbia owes the upstream pipelines money for goods and services they have provided to Columbia. Although Columbia's customers pay the charges of the upstream suppliers dollar-for-dollar through Columbia's rates, the chronology of the flow of money is totally different from the customer refunds and GRI surcharges. The bankruptcy court found Columbia pays upstream suppliers and *subsequently* recovers its costs from its customers. Since Columbia pays the upstream suppliers before it receives money from its customers, Columbia does not act as a conduit or a collecting agent for the upstream suppliers. The upstream pipelines are in the same position as every other unsecured creditor.

997 F.2d at 1063 (footnote omitted).

*Columbia Gas* was followed by *In re Globe Store Acquisition Co., Inc.*, 178 B.R. 400 (Bankr.M.D.Pa.1995). There, the debtor, a large local department store, had collected utility bill payments as an accommodation to its customers. The store also helped a local nonprofit theater by selling its tickets and, whether on the store's sale of tickets or otherwise, collecting customer payments due the theater. When the department store became a debtor in bankruptcy, the utility bill and ticket sale proceeds were claimed as part of the estate in bankruptcy, a claim contested by both the utility and the theater.

---

17. The Court had already concluded that Congress intended the scope of § 541(d) "to include not only funds held in express trust, but also funds held in constructive trust." *Id.* at 1059. Support was found in the following passage from the Code's legislative history (H.R.REP. No. 95–595, 95th Cong., 1st Sess. 368 (1977), *reprinted* in 1978 U.S.C.C.A.N. 5963, 6324):

Situations occasionally arise where property ostensibly belonging to the debtor will actually not be property of the debtor, but will be held in trust for another. For example, if the debtor has incurred medical bills that were covered by insurance, and the insurance company had sent the payment of the bills to the debtor before the debtor had paid the bill for which the payment was reimbursement, *the payment would actually be held in constructive trust for the person to whom the bill was owed.*

(Emphasis added when quoted by Third Circuit, 997 F.2d at 1059.)

18.

In *Penn Central*, railroads that shipped goods traveled over railroad tracks owned by many different railways. To facilitate operations, the shipping railroad collected the entire charge from the customer, a portion of which it owed to the other railways whose tracks had been utilized. The railroad industry voluntarily created a complex system of accounting for these interline revenues and settled the balances in each interline account monthly.

*Id.* at 1059–60.

The utility's position was that a written agreement with a predecessor store established a trust relationship and hence "the moneys received by the Debtor were trust funds and therefore belonged to the beneficiaries of the trust, i.e., [the utility]." 178 B.R. at 401. The Bankruptcy Court accepted this argument, relying on the written agreement and *resulting trust* concepts as set forth in RESTATEMENT OF THE LAW OF TRUSTS (SECOND) § 404 and *Columbia Gas*.[19]

The theater also posited its claim on a trust theory and the effect of 11 U.S.C. § 541(d) in excluding the ticket sale proceeds from the bankruptcy estate. However, "a more amorphous relationship [existed] between the Debtor and the Theater" than between the utility and the store. 178 B.R. at 403. Not having the benefit of a written agreement, the theater relied on *constructive trust* concepts (including unjust enrichment of the debtor) to support its position. The Court rejected the theater's trust claim, as follows:

> While we are mindful that an entity which receives something for no consideration, and not as a gift, is unjustly enriched, we are compelled to observe that if that were the only standard, then every creditor in every bankruptcy estate could claim to be the beneficiary of a constructive trust and therefore not subject to the distribution schedules outlined by the Bankruptcy Code.

*Id.* at 404.[20]

*In re LAN Tamers, Inc.,* 329 F.3d 204 (1st Cir.), *cert. denied sub nom. Ostran-* *der v. City of Springfield, Mass.,* 540 U.S. 1047, 124 S.Ct. 808, 157 L.Ed.2d 695 (2003), revisits *Columbia Gas* and enriches the discourse as to the application of § 541(d). Holding that the debtor was only a "delivery vehicle" for money paid pursuant to a federal subsidy program designed to benefit schools by allowing them affordable high-speed internet access, the First Circuit excluded the federal funds from the bankruptcy estate. After providing, as in *Columbia Gas,* for the incorporation of federal law into the § 541(d) property determination, the First Circuit continued:

> Just as the language of § 541(d) does not invariably incorporate state law, it is not always limited to trusts either. To be sure, since the separation of legal and equitable interests is characteristic of a trust, there will be overlap. In some of the cases discussed above, courts classified the excluded property as the corpus of a trust of some kind. *E.g., Columbia Gas,* 997 F.2d at 1059–60.... And Congress referred to a "constructive trust" in ... [its "legislative history"]....[21]

> > This usage may prove confusing, however, because these supposed trusts might lack characteristics of trusts recognized for other purposes under state law. We think it better to avoid the language of trusts and rest our holding more simply on the fact that LAN Tamers, as a mere delivery vehicle, lacked an equitable interest in the reimbursements under the federal program.

---

**19.** The Court went on to deal with the issue of commingled funds, an issue not reached *sub judice.*

**20.**

> Although the Debtor understood that it was obliged to pay the Theater for the tickets that it financed, this obligation appears to

be no different than the duties the Debtor would have to pay its other suppliers of merchandise.

*Id.* at 404.

**21.** *See* legislative history quoted at note 17, *supra.*

*Id.* at 214 (footnote and trailing citations omitted).

### Contractual Rights Contention

Though § 541(d) has no direct application *sub judice*, it is nonetheless a prism through which the broadly stated estate property concepts of § 541(a)(1) can be analyzed.

*In re LAN Tamers, Inc.* would venture into federal *nontrust* common law to derive a conduit theory of exclusion of equitable interests from the bankruptcy estate.[22] Like *Columbia Gas*, *LAN Tamers* could superimpose on the Bankruptcy Code solid nonbankruptcy Congressional policy [23] (whether to incorporate it into federal trust common law as in *Columbia Gas* or into a looser mere conduit theory as in *LAN Tamers* ).

■ In the immediate case, there is no comparable to the clear federal statutory policy of *Columbia Gas* and *LAN Tamers*. Instead, the plaintiffs rely on the web of contracts, contending first that the contracts bestowed equitable title upon Pemaquid and rendered Legion a "mere conduit" for Pemaquid's funds. It is emphasized that this argument is purely a function of contract interpretation, with its intended end point being to establish Legion as a "mere conduit" for premium and reinsurance proceeds; though this end point is where *LAN Tamers* and *Columbia Gas* came out (as to certain funds), the plaintiffs' path here is distinctly different from that of the Circuits.

The facts of the "up" and "down" flow of premiums/reinsurance payments belie the plaintiffs' contract-based contention. Clearly, Pemaquid disclaimed any and all interest in *premium;* moreover, the reinsurer's obligations to Legion were distinct from the Pemaquid–Mutual relationship. Legion was burdened with primary responsibility, as Policy insurer, to the insured, and the reinsurer undertook a like primary obligation to Legion. In addition, Legion did not cede the entire premium; instead, it used a portion to purchase catastrophic reinsurance to pay certain expenses, to "seed" projected loss funding, and to pay its "commissions." Whether Legion's ceding of the balance of premiums allows it to be characterized as a "mere conduit" for upstream premiums is quite problematic. As a threshold matter, for whom does the trustee contend Legion served as a conduit of premium? It certainly is not Pemaquid, given the afore-referenced disclaimer. A secondary point, the propriety under applicable insurance law of passing the largest part of premiums paid for domestically marketed insurance policies to unlicensed offshore operations, is left to the regulators. But most significantly, for present purposes, if courts were readily to permit the slathering of the "mere conduit" moniker onto parties participating in complex financial/fund-transfer transactions, there would be general uncertainty if not chaos as to asset ownership and availability.[24] The

**22.** The *Columbia Gas* majority was not ready to define the 541(d) exclusion in other than trust terms. 997 F.2d at 1059 n. 7.

**23.** *Columbia Gas* emphasized both the *Natural Gas Act,* 15 U.S.C. §§ 717–717W (1988 and Supp. III 1991) and substantial Federal Energy Regulatory Commission ("FERC") rules as applicable nonbankruptcy law. *See, e.g.,* 997 F.2d at 1051–52. *LAN Tamers* identified the 1996 *Telecommunications Act,* 47

U.S.C. § 254(b)(6), (h)(1)(2000), and Federal Communications Commission ("FCC") regulations at 47 C.F.R. §§ 54.701, 54.702, and others. *See, e.g.,* 329 F.3d at 206–07.

**24.** Secret interests, like secret liens, are drags on active commerce and commercial finance. So too are uncertain interests and liens whose existence depends on after-the-fact litigation. *Contrast* Article 9 of the Uniform Commercial Code, which provides a lawful method by

current overuse of unrestrained trust arguments (culminating in what is increasingly the sought after remedy of desperation and last resort—the constructive trust) would be coupled with an even less-law-connected conduit characterization.

And, however one views the premium upflow here, the downflowing reinsurance proceeds were not simply passing through Legion on their way to pay claims; they were the tender by which Legion was to meet *its responsibility* (not Pemaquid's nor the reinsurer's) to claimants. The complexity of the insurer-reinsurer relationship as evidenced by the Reinsurance Agreement (including intricate insurance reconciliation requirements at Article VI, credits for such things as "salvage," "reimbursement," and "recovery," Article III 3, adjustment to and averaging in the "Paid Loss Deposit Fund," Article IV, etc.), establish a full and constantly adjusting business/financial arrangement between Legion and the reinsurer. Accordingly, "two sophisticated insurance companies" developed an intricate indemnity-like relation-

ship. *British Ins. Co.*, 335 F.3d at 213. Any net amount due one way or the other would be basic unsecured business debt. *Compare Columbia Gas*, 997 F.2d at 1063; *Globe*, 178 B.R. at 404. No simple pass-through can be made out under these circumstances.

Furthermore, the severability of the Legion-reinsurer relationship from Pemaquid is made crystal clear by the settlement between the Commissioner and Mutual (along with its affiliated reinsurers). *Compare* the broadly inclusive Commutation Agreement of April 23, 2003 with the MB demand letter to Pemaquid of August 20, 2003.[25] (D15, 19 and D6, Exhibit Q, Subexhibit C, respectively.)

Ultimately, the plaintiffs argue that a linkage provision[26] in the Shareholder Agreements puts Pemaquid in a position to claim its dividends directly from Legion (and the Imprest Account balances). However, linkage is not enough. No one contests the existence of a "rent-a-captive" program and its interconnected pieces.

which interests in bank accounts can be hypothecated. UCC 9–104, 314, 327 and 342.

25. Of course, if the MB demand is accurate, it establishes the absence of any underwriting profit due Pemaquid (now the trustee), thus undercutting the cornerstone of the trustee's case (which is that the Imprest Account balance represent that profit). That issue will, presumably, be resolved in the ongoing Bermuda litigation. For present purposes, it is sufficient to conclude that Pemaquid's deal with Mutual, though structured through and around the Investment Mechanics and the Insurance Mechanics *did not and should not* impair the Commissioner in her public responsibility from garnering reinsurance in bulk to meet the insurer's primary responsibility to policyholders (or to various state guaranty funds standing in their stead). And this Court should be mindful of the Commissioner's duties and the Commonwealth's liquidation proceeding. *Cf. Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

26. The SA provides:

WHEREAS, this Agreement, the Policy, and the Treaty [i.e. the Reinsurance Agreement] together constitute a single insurance program (hereinafter the "Program") which is a uniquely negotiated single contract and no part of the Program would have been entered without the other parts being in force.

It should be noted that though Mutual is the parent of Legion, MB and MBar, only Mutual and Pemaquid (in one instance) or United Messenger (in the other) executed the SAs. Moreover, the RA (or Treaty) dated back to 1988, substantially predating the 1996 SAs; omitted from this "single contract" SA provision is any reference to the Management Agreement, the Brokerage Agreement, and the TPAs; and, the SAs (at 4) committed the shareholder (Pemaquid or United Messenger) to "pay all premiums due to Insurance Company [Legion] promptly and in full," but made no reference to any *Legion* obligation of remittance to the shareholder.

However, those connections did not (i) relieve Legion of its primary Policy obligations, (ii) establish any other party as primary Policy obligees, (iii) relieve the reinsurer of its primary obligation to Legion, (iv) establish any other party as primary reinsurance obligee, (v) overcome Pemaquid's disavowal of any interest in *premium*, (vi) expressly (or implicitly) obligate Legion to Pemaquid for retained reinsurance proceeds, or (vii) expressly (or implicitly) override the authority of the Commissioner as liquidator of Legion to commute and settle reinsurance accounts in bulk (and to apply settlement proceeds as it sees fit to fulfill her duties as liquidator of Legion).[27]

In the final analysis, Legion participated in a dynamic insurer-reinsurer relationship which generated ordinary business credits and debts. Legion was the recipient of reinsurance proceeds which it deposited into its general operating account; it then drew on that account to fund the Imprest Accounts managed by the TPAs and thus met its obligations under the Policies. Legion was in no sense a "mere conduit" of reinsurance proceeds.[28]

*Resulting Trust Contention*

As a practical matter, it is difficult to conceive of any remaining plausible argument for the plaintiffs' resulting trust contention, given this Court's rejection of the "mere conduit" contract contention. However, as previously indicated, conceptually the "mere conduit" rubrics of both *LAN Tamers* and *Columbia Gas* (which differ somewhat *inter se* ), are each a different

species than the resulting trust theory as it would be applied in the immediate case.

Recall that *LAN Tamers* is a case conceived of (i) as determining a § 541(d) exception to the broad sweep of § 541(a) property of the estate, and (ii) as being decided under *nontrust federal law* devolved from federal statutory law establishing "significant federal interests." The First Circuit is clear in its parsing of the variables of state law from federal law, and trust law from a well-defined federal program ("[j]ust as the language of § 541(d) does not invariably incorporate state law, it is not always limited to trusts either .... because these supposed trusts might lack characteristics of trusts recognized for other purposes under state law .... [it is] better to avoid the language of trusts and rest our holding more simply on the fact that *LAN Tamers*, as a mere delivery vehicle, lacked an equitable interest in the reimbursements under the federal program"). 329 F.3d at 214. *See also, In re Joliet–Will County Cmty. Action Agency*, 847 F.2d 430, 432–33 (7th Cir.1988).

The Third Circuit's *Columbia Gas* was also (i) a 541(d) case, but (ii) was decided under federal common law trust theory (though footed in a federal regulatory interest comparable to that of *LAN Tamers* ). 997 F.2d at 1059–60, 1062. Judge Nygaard, in partial dissent, presaged *LAN Tamers* as follows:

I agree with the majority to the extent that commingling of funds and payment of interest do not preclude a conclusion that Columbia has no equitable interests in these FERC-mandated refunds under

---

**27.** Consider the Commissioner's post-Commutation Agreement transfer of funds to the New Jersey Imprest Account. (*See* D3, Exhibit N).

**28.** This conclusion applies whether the RA-required "Paid Loss Deposit Fund" is in fact the Imprest Accounts (as the plaintiffs contend) or a separate and distinct Legion bookkeeping account (as the Commissioner contends). Of course, the plaintiffs' position ignores the documentary chronology: the RA was signed in 1988 while the TPAs (the clearest contract connection to the Imprest Accounts) were not signed until 1997.

11 U.S.C. § 541(d). I disagree, however, with the application of trust law when it is clearly unsuited to this issue. When nothing indicates one way or the other whether the parties intended to create a trust, and moreover, Columbia, by seeking to distribute these refunds to the customers was simply trying to obey the law, there is no good reason to apply the law of trusts, which after all is predicated upon the intentions of the parties to create a fiduciary duty. Instead, we should balance the competing policies and try to discern the *congressional* intent behind the Bankruptcy Code, 11 U.S.C. § 541(d), and the National Gas Act. . . .

997 F.2d at 1065 (citations omitted).

*Globe* comes closer to the matter *sub judice* in its reliance on state trust law (and indeed, the law of resulting trust as to the utility payments). However, being in the prevalent posture where a claimant seeks to exclude nominally held funds from the bankrupt estate, the case is decided under 11 U.S.C. § 541(d). Like *Globe*, state resulting trust law is at issue here; unlike *Globe*, there is no direct application of the Code's property exclusion of § 541(d).

The RESTATEMENT OF THE LAW OF TRUSTS (THIRD) defines a resulting trust as follows:

> [A] reversionary, equitable interest implied by law in property that is held by a transferee, in whole or in part, as trustee for the transferor or the transferor's successors in interest.

*Id.*, at § 7, p. 86. Such an implied trust, not manifestly intended by the transferor, "arises when a [transferor] makes or causes to be made a disposition of property under circumstances (i) in which some or all of the transferor's beneficial interest is not effectively transferred to others (and yet not *expressly* retained by the transferor) and (ii) which raise an unrebutted presumption that the transferor does not intend the one who receives the property (the 'transferee') to have the remaining beneficial interest." *Id.* at § 7, p. 86, cmt. a. In Pennsylvania, *see Mooney v. Greater New Castle Dev.*, 510 Pa. 516, 520–21 and 522–23, 510 A.2d 344, *cert. denied* 479 U.S. 915, 107 S.Ct. 317, 93 L.Ed.2d 290 (1986); *Masgai v. Masgai*, 460 Pa. 453, 460–61, 333 A.2d 861 (1975); *In re Summers' Estate*, 424 Pa. 195, 199, 226 A.2d 197 (1967); *Policarpo v. Policarpo*, 410 Pa. 543, 545–46, 189 A.2d 171 (1963). The Supreme Court of Pennsylvania has consistently imposed a heavy burden of proof on a party which would establish a resulting trust. "[T]he evidence must be 'clear, direct, precise, and convincing.'" *Masgai*, 460 Pa. at 460, 333 A.2d 861, citing *Policarpo*, 410 Pa. at 545, 189 A.2d 171. As with any oral trust, "'unless the evidence of [its] existence . . . is of the highest probative value, equity should not act to convert an absolute ownership into an estate of lesser quality.'" *Masgai*, 460 Pa. at 460, 333 A.2d 861, citing *Sechler v. Sechler*, 403 Pa. 1, 7, 169 A.2d 78 (1961). *See also Galford v. Burkhouse*, 330 Pa.Super. 21, 30–31, 478 A.2d 1328 (1984). In Texas, *see Nolana Dev. Ass'n v. Corsi*, 682 S.W.2d 246, 250 (Tex.1984); *Roberts v. Squyres*, 4 S.W.3d 485, 489 (Tex.App.1999); *Lifemark Corp. v. Merritt*, 655 S.W.2d 310, 316 (Tex.App. 1983). In New Jersey, *see Graham v. Onderdonk*, 33 N.J. 356, 363–64, 164 A.2d 749 (1960) (recognizing that the purpose of a resulting trust is "to effectuate the inferred intent of the parties" such that "where the intent appears from the circumstances, it is unnecessary to give effect to the presumption of intent"); *Hill v. Warner, Berman & Spitz, P.A.*, 197 N.J.Super. 152, 167–68, 484 A.2d 344 (App. Div.1984) ("[a] resulting trust arises where a person makes or causes to be made a disposition of property under circum-

stances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest therein, unless the inference is rebutted or the beneficial interest is otherwise effectively disposed of,") referring to 2 RESTATEMENT, TRUSTS 2, § 404 (1959); *In re Voorhees' Trust*, 93 N.J.Super. 293, 298–99, 225 A.2d 710 (App.Div. 1967) (although a resulting trust may be inferred when an express trust fails, a resulting trust is *not* inferred if the intent of the settlor, gleaned from the instrument and extrinsic circumstances, rebuts the inference of resulting trust). *See also Turro v. Turro*, 38 N.J.Super. 535, 540–41, 120 A.2d 52 (App.Div.1956) (to raise the presumption of resulting trust the proofs must be "very clear").

■ The immediate facts are not congruent with resulting trusts in five principal regards. First, the *premiums* as such were never the property of Pemaquid,[29] thus making it difficult to conceive of these "upflow" funds as having been "transferred" by Pemaquid. While it is true that the upflow funds were not to *profit* Legion (after its six-percent commission and other allowed expenses were drawn), they nevertheless were to be totally available for the purchase of reinsurance and to provide for claims against Legion-issued Policies and claim-related expenses.

A second incongruity in the matter *sub judice* is that the "downflow" funds earmarked for claim settlement did not emanate *from Pemaquid.* The reinsurer maintained the Loss Fund into which premium dollars were paid; the Loss Fund (including interest earned on it) was available to satisfy program claims *through Legion.* Thus, to establish a resulting trust the plaintiffs would have to posit that *the reinsurer* did not intend Legion to retain funds which might remain (even temporarily) with Legion in the Imprest Accounts. (In fact, the best argument the plaintiffs can muster is the farfetched allegation that *Pemaquid* did not intend that *the reinsurer's* remittance to Legion would allow funds to remain with Legion.) Apart from the plaintiffs' questionable standing to argue the mind-set of the reinsurer, the well-developed and preexisting relationship between Legion and the reinsurer contemplated an ongoing account reconciling business process, not one evidencing the requisites of resulting trust.

Third, Legion (now the Commissioner) has not closed out its "book of business" in terms of United Messenger Courier Program liability—particularly with regard to claims of various state guaranty funds.[30] The claim filing deadline in Legion's liquidation "has not yet expired" (D3, Exhibit Q, 50). Hence, there might be no "residue" at all.

29. *See, e.g.,* MA, Sec. 9D (D3, Exhibit F), which provides as follows:

All premiums collected by the Manager [Pemaquid] are to be held in a fiduciary capacity for the Company [Legion] in an account in a bank which is a member of the Federal Reserve System, and are the property of the Company. The burden of collection of all premium, including but not limited to premium installments, audit premiums and assessments, shall be borne by the Manager and paid to Company whether collected or not. The Manager has no interest in the premiums collected by it and shall make no deductions therefrom before paying the same to the Company except for the compensation authorized [i.e. commissions].... The Manager shall not make personal use of such premium funds either in paying expenses of the Manager or otherwise.

Consistent therewith, *see, e.g.,* BA, Sec. B (D3, Exhibit G); SA–P, Sec. 4 (D8, Exhibit A); and SA–UM, Sec. 4 (D8, Exhibit B).

30. *See* D3, Exhibit Q 47–50; N.J.S.A. 34:15–89 *et seq. See also* N.J.S.A. 34:15–103 *et seq.;* N.J.S.A. 34:15–120.16.

Fourth, this matter is not congruent with cases employing the resulting trust remedy because of complexities in accounting for premium payments between Pemaquid and Legion. The Commissioner claims that millions of premium dollars are due *from Pemaquid;*[31] indeed, Pemaquid was responsible for premiums *whether collected or not.*[32] Whether the Commissioner can ultimately establish, for example, that any part of premium dollars for issued but unpaid policies is due, remains in large part a function of the auditing and proof process in the Legion liquidation, and perhaps in this case.[33]

And finally, the Mutual reinsurers have settled their accounts with the Commissioner with respect to all reinsurance and Loss Fund obligations arising out of their relationship with Legion.[34] The settlement plainly reflects the contractual positions of insurer and reinsurer and embodies a basic business adjustment, not the artificiality of imposed trust notions. It also raises the question: if Mutual and its affiliates have thus waived any claim to the balances in the Imprest Accounts, what position could Pemaquid or, now, the trustee and his affiliates have as to a hoped for residual amount? At best, the plaintiffs are left with a claim against Mutual, poten-

tially part of ongoing litigation with Mutual in Bermuda.[35]

*Constructive Trust*

Though not formally asserted by the plaintiffs, *constructive trust* theory should also be tested against the facts of this case. As previously indicated, a snippet of legislative history to 541(d) refers to "constructive trust," [36] thus setting in motion a hunt for its bankruptcy implications.[37]

▮ The RESTATEMENT OF THE LAW OF RESTITUTION (FIRST), § 160, provides:

Where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it, a constructive trust arises.

Moreover, "[a] constructive trust does not, like an express trust, arise because of the manifestation of an intention to create it, but it is imposed as a remedy to prevent unjust enrichment." *Id.* at 160 cmt. a. Constructive trust is thus distinguished from resulting trust, where circumstances raise an inference that the transferor of property did not intend the transferee to have a beneficial interest in that property. *Id.* at 160 cmt. b.

▮ Much of what was previously expressed as to the lack of justification to

---

31. The Commissioner's September 9, 2004 proof of claim is for "[b]oth collected and uncollected premiums" in the asserted amount of $15,196,000. *See* claims register in main case # 19.

32. "The Manager [Pemaquid] shall remit to the Company [Legion] all premiums, *whether collected or not.* ..." MA, Sec. 9B (D3, Exhibit F) (emphasis added). *See also* BA, Sec. B (D3, Exhibit G).

33. Various rights to setoff between Legion and Pemaquid persist. *See* MA, Sec. 19 (D3, Exhibit F). *See also* Mutual's right to setoff for unpaid premiums. SA–P, Sec. 4 (D8, Exhibit A); and, SA–UM, Sec. 4 (D8, Exhibit B).

34. *See* D10, Exhibit W; D6, Exhibit Q, Subexhibit C.

35. In fact, the trustee and other plaintiffs are defendant-counterclaimants in Mutual's Bermuda suit. *See* D6, Exhibit N.

36. *See* note 17 *supra*.

37. *See* Keach, *"The Continued Unsettled State of Constructive Trusts in Bankruptcy: Of Butner, Federal Interests and the Need for Uniformity,"* 103 COM. L.J. 411 (1998).

impose a resulting trust applies likewise to the constructive trust concept. The plaintiffs can neither establish that the Commissioner through Legion has been unjustly enriched by retaining the Imprest Account balances, nor that the trustee and others through Pemaquid have been unjustly deprived of those balances. In particular, Legion's entitlement to premiums vis-à-vis Pemaquid, the insurer's still open books of account regarding claims in the liquidation proceeding, and persisting offset issues, all undercut the conclusion that the Commissioner is being unjustly enriched by exercising its titular rights to the Imprest Account balances. Unjust deprivation of the plaintiffs' interest in the accounts is likewise negated.

 There is also a substantial question as to the efficacy of imposing a constructive trust *after a liquidation order* has provided for the marshaling of all Legion assets[38] to meet general distribution needs. If that order were, hypothetically, a bankruptcy petition and the usual fact pattern (i.e., claimant seeking the exclusionary effect of 541(d)) persisted, ratable distribution under the Bankruptcy Code would be at risk. It has been posited that "[a]t a minimum, only property which is the subject of a pre-petition final order specifically imposing a constructive trust should be excluded from the estate, or result in a special priority for the claimant." Keach, 103 Com. L.J. at 448.[39] Whether such a bright line test will prevail in bankruptcy given the current structure of 541(d) and the potential rigidity of such a test remains to be seen.[40] In any event, heavy burdens should be imposed on claimants seeking to upset ratable distribution precepts of bankruptcy—and in roughly comparable state liquidation schemes such as that under which the Commissioner is operating. That burden can be carried in one or another circumstance where, e.g., there is a clear and precise federal policy favoring a claimant over general distribution (as in *Columbia Gas* and *LAN Tamers*), or where resulting trust law applies and is clearly established (as in *Globe*), or where identifiable and specific prepetition judgments firmly establish rights to nonratable distribution (as in *DeLauro*); *sub judice*, no such foundation for an equitable remedy persists. Nor does the fact that the claimant here includes a trustee in bankruptcy (having his own Code-required distribution obligations) add any merit to the case for constructing a trust out of thin allegations.

### Conclusion

The trustee and other plaintiffs would have this Court wrest two bank deposit

---

**38.** The July 25, 2003 Order of Liquidation (D3, Exhibit B), *clearly* establishes control over the assets of Legion, creating an estate akin to that which § 541(a) would create in bankruptcy; to wit:

> 7. The Liquidator is vested with title to all property, assets, contracts and rights of actions ("assets") of Legion of whatever nature and wherever located, held as of the date of filing of the Petition for Liquidation. All assets of Legion are hereby found to be *in custodia legis* of this Court . . .

**39.** This proposition was offered in the context of a suggested legislative change to the Code. *See also* Sherwin, "Constructive Trust in Bankruptcy," 1989 U. of Ill. L.Rev. 297, 365 ("Perhaps a remedial application of constructive trust in bankruptcy is not feasible, because the litigation required is too costly to justify its results").

**40.** *Consider In re DeLauro*, 207 B.R. 412 (Bankr.N.J.1997) (where a prepetition settlement agreement provided for the transfer of real property from husband to wife that agreement was incorporated into a prepetition final judgment of divorce, and the bankruptcy court thereafter imposed a constructive trust on the undeeded realty in favor of the wife and contrary to the position of the debtor-husband's trustee in bankruptcy).

accounts away from the Commissioner, notwithstanding the following undisputed facts:

(i) the Commissioner's predecessor in interest, Legion, was the bank customer who opened the accounts in its name, and controlled those accounts;

(ii) the subject accounts became liquidation estate property *in custodia legis* before the current bankruptcy case was initiated; and

(iii) complex contractual arrangements designed to legitimize a "creative" insurance program failed to define any specified interest in the subject accounts other than that of Legion.

No reasonable assessment of the component parts or the whole of the "rent-a-captive" insurance program at the heart of this proceeding renders Legion a "mere conduit" for any account funds attributable to the debtor, Pemaquid, or the partnership, United. Nor has either a resulting or constructive trust in the accounts in favor of Pemaquid or its partnership, United, been established. In fact, there is no specific expression in, or reasonable implication to be drawn from the documents and relationships of the various parties to the insurance program to support any legal or equitable remedy sought by the trustee and the other plaintiffs. The Imprest Accounts are thus found not to be property of the estate in bankruptcy or of the debtor's affiliates, and remain the property of the liquidator, the Commissioner of Insurance of the Commonwealth of Pennsylvania. Summary judgment is awarded the Commissioner on her motion, and the plaintiffs' motion is accordingly denied. An implementing order will be entered by this Court.